# GASS *v.* STATE.

## (*Knoxville.* September Term, 1914.)

1. **CRIMINAL LAW. Repeal of statutes. Effect as to offense.**
Code 1858, sec. 49, providing that the repeal of a statute does not affect any proceeding commenced under it, applies to criminal cases, and abolishes the common-law rule that the repeal of a statute after an offense has been committed under the act annuls the offense. (*Post, pp.* 585-588.)

Acts cited and distinguished: Acts 1911, ch. 44.

Code cited and construed: Code 1858, sec. 49.

Cases cited and approved: State v. Willis, 130 . Tenn., 412; Richardson v. State, 43 Tenn., 122; Roberts v. State, 2 Tenn., 423; Bennett v. State, 10 Tenn., 472.

Cases cited and distinguished: Hill v. State, 73 Tenn., 730; State v. Nashville Bank, 84 Tenn., 118; Wallace v. Goodlett, 104 Tenn., 680; Shelby County v. Railroad Co., 84 Tenn., 408; Railway & Light Co. v. Norvell, 122 Tenn., 618; Standard Oil Co. v. State, 117 Tenn., 650.

2. **BANKS AND BANKING. Receiving deposit while insolvent. Testimony of receiver.**
In a prosecution for receiving a deposit knowing the bank to be insolvent, testimony of the receiver of the bank on the issue of insolvency that he was acquainted with the value of the assets at the time of the deposit is competent, where he showed that the valuation was in accordance with his best judgment, the weight of the evidence depending on his means of knowledge. (*Post, p.* 588.)

3. **CRIMINAL LAW. Appeal. Estoppel to allege error.**
A party calling out evidence on cross-examination may not assign error thereon. (*Post, pp.* 588, 589.)

4. BANKS AND BANKING. Receiving deposit while insolvent.
   Evidence. Subsequent condition.

   In a prosecution for receiving a deposit knowing the bank to
   be insolvent evidence on the issue of insolvency as to the value
   of the assets at a subsequent time is competent if the period
   concerning which inquiry is made is sufficiently near the date
   of deposit to make it improbable that any material change
   in the solvency of the assets has occurred. (*Post, pp.* 589, 590.)

5. CRIMINAL LAW. Evidence. Res inter alios acta.

   In a prosecution for receiving a deposit knowing the bank to be
   insolvent, on the issue of insolvency, evidence that at a meeting
   of bankers relative to loaning the bank money to tide it over,
   they refused the loan, is inadmissible, defendant not being
   present. (*Post, pp.* 590, 591.)

6. CRIMINAL LAW. Evidence. Hearsay.

   In a prosecution for receiving a deposit knowing the bank to be
   insolvent, testimony of a witness as to the insolvency of the
   company derived solely from what was said at a meeting of
   bankers is inadmissible as hearsay. (*Post, pp.* 591, 592.)

7. BANKS AND BANKING. Receiving deposit while insolvent.
   Knowledge of officer having control, etc.

   A person having the control or management of a bank, within
   the statute making it a felony for any such person to receive
   a deposit knowing the bank to be insolvent, is under duty to
   keep up with the assets and at all times to know their value
   as far as practicable by the exercise of due diligence. (*Post, pp.*
   592, 593.)

8. BANKS AND BANKING. Receiving deposit while insolvent.
   "Insolvent."

   Under the statute making it a felony to receive a deposit know-
   ing the bank to be insolvent, a bank is "insolvent" when its
   assets are less in value than the amount of its deposits and
   debts, exclusive of the capital stock, surplus, and undivided
   profits, allowing a reasonable time for the conversion of the
   assets into money. (*Post, pp.* 593-596.)

Gass v. State.

Cases cited and approved: Ellis v. State, 138 Wis., 513; Fleming v. State, 62 Tex. Cr. R., 653.

9. **BANKS AND BANKING.** Receiving deposit while insolvent. Evidence. Good faith.

In a prosecution for receiving a deposit knowing the bank to be insolvent, it was competent for defendant to show on the issue of good faith what arrangements he had made for money to finance the bank on account of the stringency of the money market and that, when an insolvency bill was filed against the bank, he protested against it. (*Post, pp.* 596, 597.)

10. **CRIMINAL LAW.** Reversal. Right of defendant to discharge.

Where, in a prosecution for an offense committed before the passage of the indeterminate sentence act (Laws 1913, ch. 8), which by express terms only applied to offenses thereafter committed, the jury were erroneously told not to fix punishment, and a verdict simply of guilty was rendered, the case will be reversed for a new trial, but defendant is not entitled to his discharge. (*Post, pp.* 597, 598.)

Acts cited and construed: Acts 1913, ch. 8.

Cases cited and approved: State v. Ragsdale, 78 Tenn., 671; Mayfield v. State, 101 Tenn., 673; Fitts v. State, 102 Tenn., 141; Waddle v. State, 112 Tenn., 556.

11. **CRIMINAL LAW.** Arrest of judgment. Defect in verdict.

Since arrest of judgment is proper only for some defect in the pleadings not cured by judgment, that the jury were erroneously told not to fix judgment when the indeterminate sentence act did not apply is not ground for arrest of judgment. (*Post, pp.* 598, 599.)

Case cited and approved: Green v. State, 129 Tenn., 386.

12. **CRIMINAL LAW.** Change of venue. Prejudice.

In a prosecution for receiving a deposit knowing the bank to be insolvent, affidavits showing that there were 5,000 or 6,000 depositors residing in the county, and that great prejudice

existed against the defendant among the depositors and their friends comprising perhaps 20,000 people, and that defendant was subject of bitter comment in the newspapers, were sufficient to compel a change of venue. (*Post, pp.* 599, 600.)

## FROM KNOX.

Appeal from the Criminal Court of Knox County.— T. A. R. Nelson, Judge.

Jerome Templeton, S. G. Heiskell, Jesse M. Littleton and James A. Fowler, for appellant.

Frank M. Thompson, attorney-general, for the State.

Mr. Chief Justice Neil delivered the opinion of the Court.

The plaintiff in error was indicted under chapter 44 of the Acts of 1911 of the State of Tennessee, under an indictment which reads as follows:

"State of Tennessee, county of Knox. Criminal court for Knox county, March term, 1913. The grand jurors for the State of Tennessee upon their oath present that heretofore, to wit, on the 13th day of December, 1912, in the State and county aforesaid, W. H. Gass being an officer, to wit, president, of the Knoxville Banking & Trust Company, a corporation, and as such officer having the control and management of said Knoxville Banking & Trust Company, did, on the 13th day of December, 1912, feloniously receive, as-

sent to the reception of and permit the reception of twelve hundred and ninety-nine dollars and eleven cents, good and lawful money of the United States, the kind and denomination of the same being to the grand jurors unknown, of the value of twelve hundred and ninety-nine dollars and eleven cents, on deposit in said bank and corporation. The said money having been deposited by the J. A. Webb Company, a corporation, on said date, and the said defendant at the time of said deposit then and there knew, and had good reason to believe, that said bank was insolvent against the peace and dignity of the State.''

He was convicted and subsequently sentenced by the court, and from the judgment he has appealed to this court and assigned errors.

Error is assigned on the refusal of the trial court to sustain the demurrer to the indictment on several grounds stated therein. This question has been fully considered by the court in the case No. 2 of *State* v. *Willis*, 170 S. W., 1032, and for reasons contained in that opinion this assignment is overruled.

The third assignment of error is as follows:

"It was error for the court not to hold that the Acts of 1911, chapter 44, was repealed by the Acts of 1913, chapter 20, sections 32 to 34, inclusive, page 214, the repealing act being passed March 20, 1913.''

It is said that the indictment was found March 28, 1913, and the trial began January 7, 1914. It is insisted that the court should have held that the act of 1913 repealed the act of 1911, and amounted to a

pardon, and should have discharged the defendant from custody under the indictment found under the said act of 1911. It is said this case is one wherein the indictment is based on an act existing when the alleged offense was committed, but which had been repealed before the indictment was found. In support of the assignment the following cases are cited: *Richardson* v. *State*, 3 Cold., 122; *Roberts* v. *State*, 2 Overt., 423; *Bennett* v. *State*, 2 Yerg., 472.

The last two cases cited are in accord with the contention. *Richardson* v. *State*, however, while recognizing the doctrine that by the common law the repeal of a statute creating an offense effectually obliterates it from the statute books, and that no further proceedings upon it can be had after such repeal, holds that section 49 of the Code of 1858 annuls this common-law principle, and that a conviction may be had upon an indictment or presentment for an act unlawful at the time of the occurrence, although the statute upon which the proceeding is based may have been repealed before the conviction. The principle just stated is fully confirmed by the later cases of *Hill* v. *State*, 5 Lea (73 Tenn.), 730; *State* v. *Nashville Bank*, 16 Lea (84 Tenn.), 118; *Wallace* v. *Goodlett*, 20 Pickle (104 Tenn.), 680, 58 S. W., 343.

In *Hill* v. *State*, supra, it is said:

"By the common law, the repeal of a statute creating an offense effectually annulled it just as if it had never been the law, and no proceedings could be had upon it after the repeal. But the Code (section 49)

provides:. 'The repeal of a statute does not affect any right which accrued, any duty imposed, any penalty incurred, nor any proceeding commenced under or by virtue of the statute repealed.' This provision applies in criminal cases.''

The same point is raised in the same way in *Wallace* v. *Goodlett,* supra, and it is also held in that case that the provisions of section 49 of the Code apply to statutes passed and repealed since the Code, in the absence of a contrary purpose expressed in the statutes themselves.

The same principles are supported by *Shelby County* v. *Railroad Co.,* 16 Lea (84 Tenn.), 408, 1 S. W., 32; also *Railway & Light Co.* v. *Norvell,* 122 Tenn., 618, 124 S. W., 613. And see, also, *Standard Oil Co.* v. *State,* 117 Tenn., 650, 100 S. W., 705, 10 L. R. A. (N. S.), 1015.

This assignment must therefore be overruled.

With it must likewise go assignment No. 9, which was that it was error in the court to overrule defendant's·motion during the trial to discharge the defendant. This motion was based on the same ground as assignment No. 3.

For the present we shall pass assignments Nos. 4 and 8.

It is assigned as error that the trial judge admitted testimony of the receiver's management and of the receipts by him under his receivership, as evidence upon the subject of the insolvency of the bank at the time

the deposit complained of was accepted. This point is presented in assignment No. 5.

An examination of the receiver's testimony shows that the matter complained of covered only a small part of his evidence. He says in his testimony, in substance, that he was acquainted with the value of the assets at the time the deposit complained of in the indictment was made, and he undertook to value those assets according to his best judgment. We think this evidence was competent. Of course, the weight of the evidence would depend very much on his means of knowledge, that is the sufficiency of his acquaintance with the nature of the different kinds of assets and the solvency or insolvency of the people on whom the notes, accounts, etc., rested.

In connection with this assignment should be considered the next, No. 6, which complains that the trial judge permitted evidence of the dealings of the receiver with the Tennessee Medicine Company, the McCormick Furniture Company, the Knoxville Auto & Garage Company, the Beaumont Construction Company, and the Knoxville Realty Company.

This evidence was brought out by the plaintiff in error himself on cross-examination of the receiver. The substance of it was that, shortly after the bill was filed against the bank to put it in course of liquidation, these various enterprises to which the bank had lent large sums of money all failed, and several, if not all of them, went through bankruptcy, with the result that only a trifling amount was collected from these

proceedings. The theory of the plaintiff in error was that these various concerns were all prosperous, and were keeping their interest paid up to the bank, or renewing their notes from time to time, and reducing the principal, and that, if the bank had been let alone, it would have suffered no loss on account of any of these several enterprises; that the action of the directors in filing the bill resulted directly in precipitating this loss. The cross-examination of the receiver was with a view to showing that he had given no personal attention to the bankruptcy proceedings, but had only collected what was realized through the operation thereof, the small amounts mentioned. After having called out this evidence as to the receiver's management of this part of the assets, we do not think that the plaintiff in error should be allowed to assign error thereon.

On the general question whether evidence of the value of assets at a subsequent time can be heard in a case of the kind we have before us, we think the proper view is this: The evidence is competent if the period concerning which inquiry is made is sufficiently near to the date of the deposit complained of to make it improbable that any material change in the solvency of the assets had occurred. The greater the interval of time between the two dates the less the value of the evidence becomes, until it may finally become so remote as to be wholly immaterial. This is a matter which must be judged of in each case, and no rule of a more definite character can be laid down. Certain it is, however, that the testimony would be always com-

petent if accompanied by evidence that no material change had occurred in the assets in respect of solvency between the two dates. To illustrate, if it be proven by the receiver that some months after the deposit was received, and after the failure, he was only able to collect a small percentage of the debts after diligent efforts, and there is supporting evidence that the financial condition of the debtors had not changed in the meantime. The evidence of the acts of the receiver would not only be competent, but would be very much strengthened by such additional testimony.

The thirteenth assignment raises this question: Was it error for the trial judge to permit Mr. H. B. Branner to testify that the Knoxville Banking & Trust Company tried to get the representatives of the other Knoxville banks to furnish it money, and that the reason they did not furnish it was they thought it would require too much money to tide the bank over, and they did not think it good business policy to do so; it appearing that Gass was not present and did not participate in such request.

We think this evidence was incompetent. The question to be determined was whether the bank was insolvent to the knowledge of Mr. Gass when he received the deposit, or whether he had good reason to believe that it was insolvent. The fact that a committee of bankers of the city met at the business place of the Knoxville Banking & Trust Company at the invitation of other officers than Mr. Gass, with a view to considering the matters referred to, and that they

reached the conclusions stated, after making such ex-
amination as satisfied them, could not be evidence
against Mr. Gass.  The admission of the conclusions
reached by such a committee would be to permit that
body to usurp the functions of the jury.  Of course,
any member of that committee could have properly
testified to the extent of the examination he made, and
his estimate of the value of the assets he considered,
but it would not be lawful to prove the committee's
conclusions as to the state of the business.  Moreover,
Mr. Gass was not present, as stated, and he would not
be bound in any event by any conclusions reached by
the committee in the criminal action against him, even
if the evidence was otherwise competent.  The same
result must be reached on another section of assign-
ment No. 13, which raises the question whether it was
competent to prove by Mr. Branner that the several
bankers found the Knoxville Banking & Trust Com-
pany "not in a good condition," and that they ex-
pressed an opinion as to how much money it would re-
quire "to have pulled them over and continued them
in business."

Assignment No. 14 raises the question whether the
trial judge was in error in overruling plaintiff in er-
ror's motion to exclude all testimony of the witness H.
B. Branner based on hearsay; the witness having tes-
tified that all he knew in regard to whether assets of
the Knoxville Banking & Trust Company were good or
bad was what the committee appointed by the bank-
ers of Knoxville said there in regard to it, the witness

not having personally looked over the list or over the report. All such hearsay evidence was incompetent. As previously stated, the bankers composing the committee could testify as to their own discoveries, but it was not competent for Mr. Branner to testify as to what he heard from them.

In this connection we deem it proper to consider what is the true criterion of the insolvency of a bank under the statute on the authority of which the present indictment was found. The language of the statute is:

"Hereafter it shall be a felony for any officer or officers, agent or agents, or other person or persons, having control or management of any bank in this State, to receive, assent to the reception of, or permit the reception of, any money, check, draft, note, or bill of exchange on deposit in such bank, when such officer or officers, agent or agents, or other person or persons know, or have good reason to believe, that such bank is insolvent."

The question to be decided in every such inquiry is whether the officer or agent who received the deposit knew the bank was insolvent, or had good reason to believe that it was insolvent. If actual insolvency existed and he really knew it, of course that ends the inquiry. So the real question to be determined is what is meant by the expression "or having good reason to believe that such bank is insolvent." This necessitates an inquiry into the sources of the prisoner's knowledge and of his duty to know. If he is the one described in the act as "having the control or management of any

bank in this State," it is his duty to keep up with the assets, and at all times to know their value as far as practicable by the exercise of due diligence.

Premising this much, we shall now inquire when is a bank insolvent within the sense and meaning of the statute in question. There are two theories of the subject. One is that a bank is insolvent when it is unable to pay demands made upon it in the ordinary course of business when such demands fall due, a situation in which bankruptcy proceedings could be immediately instituted against it. The other theory is that the bank is insolvent when its assets are less in value than the amount of its debts, exclusive of capital stock, surplus, and undivided profits, allowing a reasonable time for the conversion of the assets into money. It is no doubt true that, when a bank is unable to pay its debts as they fall due in the ordinary course of business, it is subject to be proceeded against by a bill in equity for the appointment of a receiver for the administration of its assets. We do not believe, however, that this state or condition of the business was such as was contemplated by the statute in question. It cannot be true that a banker is guilty of a crime in receiving a deposit if at the time the assets of the bank fully equal in value the sum of its debts, even though it may require some time to realize on those assets. The gist of the matter is that a deposit is received by a banker knowing or having good reason to believe that the money will be lost to the depositor, by reason of the inability of the bank to return it; but if the assets on

130 Tenn. 38

a fair valuation are amply sufficient to pay all depositors, including the one in question, and all other debts of the bank, exclusive of the capital stock, surplus, and undivided profits, the bank is not insolvent, nor is there any good reason to believe that it is insolvent. This meaning of insolvency is the ordinary signification of the word; that is, an insufficency of assets to pay debts. If the other theory be held a correct one, and a banker must always feel that he stands within touch of the doors of the penitentiary if he shall accept a deposit, or fail to close the doors of the bank in every case where there is danger of not being able to meet the debts of the bank on demand, his ability to extricate the business from disaster will be to a great degree paralyzed by the apprehension for his personal safety which he will necessarily feel. Such a state of mind would be an unhappy one, anxious and disspirited, destructive of initiative, and enfeebling to the will. We are far from believing that the general assembly intended to produce such results. Banks are among the most useful agencies of civilization. Into these the surplus money of a community is collected as waters into a reservoir, to flow out into all of the channels of commerce, and relieve the business needs of the community in every direction. It is to the interest of the people whom such institutions serve that they shall be made as efficient as possible. In order that this state of efficiency may be attained, the fullest scope consonant with safety must be granted to the skill and energy of trained men in the management of such

funds. Such efficiency is incompatible with a state of terror. By the exercise of this efficiency banks must be preserved from failure. Every one knows how the assets of a bank shrink and shrivel when it is compelled to stop business. Many debtors who during the running of the bank would pay their debts in order to maintain their standing, even though not wholly solvent, would cease to try to pay on the cessation of its business. Many others who are able to pay will delay until forced to settlement after transferring their allegiance to some other institution. Such property of the bank as requires to be sold will lose in value because buyers are aware of the necessity of selling, and of the inability of the bank to stand out for proper terms. One illustration of this truth is found in the building of the Knoxville Banking & Trust Company. It is a ten-story building that cost $259,000. At and before the failure of the bank this building was paying six per cent. interest on the investment. Since the failure no one has offered more than $167,000 for this property. We repeat, safety cannot be secured by terrorizing the officers of banks, with a knowledge that if they should have to close their doors at any time under a sudden stress of circumstances by reason of a change in the financial aspects of the country, or by reason of inability to quickly realize upon assets, they would be subjected to indictment and conviction on a charge of felony. Consider what would have been the effect of such a theory of the law in 1907 during the panic. Nearly all the banks of our cities in this State

refused to pay money over their counters, and likewise refused to close their doors and liquidate; but, instead, offered their customers clearing house certificates. According to such a theory all of these men committed a felony if they received any deposits. Safety is secured by requiring officers having the control or management of banks to keep closely in touch with the assets, and to have a reasonable knowledge of their value, and to refuse to receive deposits when they find they are not amply sufficient to pay all debts exclusive of capital stock, surplus, and undivided profits of stockholders. If a bank continues to do business when it is not solvent in this sense, and it receives deposits, it is guilty of negligence of so hazardous a character as to amount to positive fraud and criminal liability under the statute.

The foregoing views are, in substance, supported by the cases of *Ellis* v. *State*, 138 Wis., 513, 119 N. W., 1110, 20 L. R. A. (N. S.), 444, 131 Am. St. Rep., 1022, and *Fleming* v. *State*, 62 Tex. Cr. R., 653, 139 S. W., 598-605.

Assignment No. 7 raises the question whether the trial judge committed error in refusing to permit plaintiff in error, Gass, to testify that when he first heard that an insolvency bill was to filed against the bank he not only did not consent to it, but protested against it. The same assignment raises the question whether the trial judge was in error in refusing to permit plaintiff in error, Gass, to state in his evidence what arrange-

ments he had made for money to finance the bank on account of the stringency of the money market.

We think this was error. It may be true that Mr. Gass was guilty notwithstanding he made the protest mentioned, and notwithstanding he had made the financial arrangements referred to, nevertheless it was competent to prove both points as circumstances indicating his belief as to the solvency of the bank; hence his good faith. It is true, of course, that if, notwithstanding the existence of these facts, the State had proven that the bank was really insolvent in the sense in which we have already explained that matter, the evidence would have done him no good as a defense to the issue; still, as stated these were circumstances that were relevant to the inquiry, and might properly have influenced the jury in fixing his punishment at a shorter term, finding that he honestly entertained such belief, although that belief was not justified by the facts which he knew about the assets of the bank, or ought to have known.

Assignments Nos. 10, 11, 12, and 15 are based on the following facts: The deposit was alleged to have been made on the 12th of December, 1912. Under the law as it then stood the crime was punishable by imprisonment at a period to be fixed by the jury at not less than two nor more than six years. By an act subsequently passed (chapter 8 of the Acts of 1913) the indeterminate sentence law was created, under which the jury can respond only to the issue as to the guilt or innocence of the prisoner, the law itself attaching the penalty at the maximum, which may be reduced by good

conduct and under the parole system, the machinery of which is provided in that act. Under the terms of that act it applies only to crimes committed after its passage. The trial judge, overlooking this feature, directed the jury not to fix the punishment, stating to them that the law itself would do so. Accordingly the jury returned a verdict simply of guilty. No judgment was entered on the verdict at that term, but at the next term a judgment was entered under the indeterminate sentence law. A motion was made in the court below that the prisoner should be discharged; also that a new trial should be granted; likewise that the judgment should be arrested. The several assignments referred to present these points. The verdict, of course, was absolutely void, because of the defect arising from the failure to fix the punishment, but under such circumstances our cases hold that it is the duty of the trial judge to grant a new trial, and, if he fail, it is the duty of this court, to grant a new trial, and not to discharge the prisoner. *State* v. *Ragsdale*, 10 Lea, 671; *Mayfield* v. *State*, 101 Tenn. (17 Pickle), 673, 49 S. W., 742; *Fitts* v. *State*, 102 Tenn. (18 Pickle), 141, 50 S. W., 756; *Waddle* v. *State*, 112 Tenn., 556, 82 S. W., 827. This result follows although the trial judge himself led the jury into the error. *State* v. *Ragsdale*, supra, and *Fitts* v. *State*, supra.

The case presented was not a proper one for the arrest of judgment. That depends upon some defect in the pleadings which is not cured by verdict.

We have considered the case of *Green* v. *State,* 129 Tenn., 386, which on first blush seems to be somewhat in conflict with the other cases cited. It was not intended to interfere with those authorities, nor on careful consideration does *Green* v. *State* tend to have that effect. That case is sound when confined to its facts, but its doctrine will not be extended.

The last question is whether the trial judge committed error in refusing to grant a change of venue to Anderson county. This point is the subject of assignment No. 1.

In this connection we may state that we have not thought it necessary to follow the assignments in the order in which they appear in the brief of counsel, but in what seems to us the most convenient order.

The affidavit shows that 5,000 or 6,000 depositors of the bank reside in Knoxville and Knox county; that great prejudice exists against Mr. Gass among the depositors and their friends, and these probably comprise a great many more than 5,000 or 6,000—perhaps 20,000—people, and that, furthermore, threats have been made against him, and that he has been the subject of bitter comment in the newspapers. It may be that notwithstanding all this he could have a fair trial in Knox county; yet, as it is important that the administration of the law should be free from the influences of partisan bias, we believe the interests of justice would be promoted by a change of the venue as prayed in the petition of the prisoner.

We do not pass on assignments Nos. 4 and 8, which present the merits of the controversy as to whether, in fact, the bank was insolvent at the time the deposit was made. This is a matter for the jury, and we do not wish to be understood as expressing any opinion in the remotest way upon this subject.

The result is that the judgment and verdict will be set aside, and the cause remanded to the criminal court of Knox county, with directions to transfer the case for trial to the circuit court of Anderson county.