G. D. Moore *v.* The State.

(*Nashville.* December Term, 1928.)

Opinion filed May 25, 1929.

C. H. RUTHERFORD, J. T. BASKERVILLE and C. L. CORNE-
LIUS, for plaintiff in error.

NAT TIPTON, Assistant Attorney-General, for the State.

MR. JUSTICE SWIGGART delivered the opinion of the court.

The plaintiff in error, G. D. Moore, assigns as error that the evidence preponderates against his conviction for receiving deposits in a bank, of which he was cashier, at a time when he had good reason to believe that the bank was insolvent.

The indictment charged that Moore had knowledge of the insolvency of the bank at the time he received the deposit in question, but the trial judge, ruling upon the motion for a new trial, has stated that the proof convinced him that the plaintiff in error did not know or believe his bank insolvent, and approved the conviction because he believed from the proof that the plaintiff in error did have "good reason to believe" the bank insolvent, and, therefore, rendered himself guilty under the statute, Acts 1913, chapter 20, section 34.

It does not appear to be seriously contended in this court that the proof is insufficient to show that the bank was insolvent in fact; but counsel for plaintiff in error correctly insist that the guilt or innocence of the plaintiff in error must be determined by considering the condition of the bank as nearly as possible as it appeared to the plaintiff in error at the time the deposit was received.

The Bank of Portland, of which plaintiff in error was cashier, had a capital stock of $25,000, and showed on its books a surplus of about $9000. All of the capital stock except eleven shares was owned by the father of the

plaintiff in error, R. D. Moore, who took an active interest in the management of the bank until it was closed.

The conviction is for receiving a deposit from C. W. Kerley on the morning of October 4, 1926. During that day practically all of the available cash of the bank was exhausted by the withdrawal of about $10,000 in deposits. At the close of the day the bank had less than $300 in cash, with several hundred dollars owing by other banks, and, therefore, collectible on demand. A meeting of the directors after banking hours resulted in a decision to transfer the bank to the State Banking Superintendent for liquidation. Referring to this meeting of the directors and the decision to surrender the bank for liquidation, and to the fact that the cash had been reduced to less than $300 by the withdrawals of the day, the plaintiff in error testified: "We knew that we could not run with that amount of stuff on hand, and rather than to involve any of the depositors, or anything like that, we decided that night not to reopen the next morning."

The statement of the bank's assets and liabilities at the close of its active business showed deposits in the sum of $126,500, of which $51,800 were time deposits. The total loans and discounts were $221,700. In addition to the deposits other liabilities, excluding capital stock and surplus, consisted of $80,000 borrowed from other banks, and outstanding cashier's checks of $1100.

It is probable that the conviction of the plaintiff in error was brought about by the fact that $90,000 had been loaned by the bank to the father, brothers and uncle of the plaintiff in error, and to firms and corporations in which the brothers were interested. The opinion of the learned trial judge, rendered on the hearing of the mo-

tion for a new trial, however, discloses that he considered the insolvency of the bank to have resulted from the fact that practically the entire capital had been withdrawn by R. D. Moore, the father of plaintiff in error, in the form of loans, and the fact that $40,000 of the assets of the bank consisted of loans secured only by second mortgages on farm property.

Much of the record is devoted to the solvency of the Highland Rim Crate & Furniture Company, the Hardison-Hill-Moore Company, and a flour mill, large debtors of the bank, in which brothers of the plaintiff in error were either in control or heavily interested. The trial judge held that the proof was, perhaps, sufficient to establish the solvency of the Crate & Furniture Company and of the Hardison-Hill-Moore Company. While we are inclined to agree with the trial judge, it is quite apparent that both of these concerns were very much involved and had borrowed the limit, their ability to repay being limited to future earnings or proceeds of liquidation. Their debts could not be regarded as quick assets of the bank.

The record does not disclose how long the $40,000 of loans secured by the second mortgages had been outstanding, but it does appear that they were several years old. It appears that the bank had made large loans on real estate prior to 1920, when land values were high, and that after the drop in land values they had permitted the borrowers to procure as much as they could from Federal Land banks and insurance companies on long time first mortgage loans, paying the proceeds to the bank in part payment of their obligations to it. The $40,000 of second mortgage loans represented the balance owing to

the bank after the proceeds of the first mortgage loans had been so applied.

Without reference to the proof that none of these second mortgage loans had been collected by the receiver, and that whenever a foreclosure sale had been made, the proceeds were insufficient to satisfy the first mortgage, the trial judge stated that it was apparent that the bank had collected all the money it could collect on these debts when the second mortgages were taken, and that the plaintiff in error was not justified in carrying the second mortgage notes as solvent assets of the bank. We find no sufficient answer to this holding of the trial judge, either in the proof or in the brief and argument of counsel.

With respect to the aggregate loan of $26,000, made to R. D. Moore, president and owner of the capital stock of the bank, the trial judge was of the opinion that the plaintiff in error had no reasonable or just cause to regard his father as solvent or the loan as an asset of the bank. As held by the trial judge, it is obvious that the ownership of the shares of stock in the Bank of Portland could not be regarded as an asset of R. D. Moore, in determining whether his debt to the bank could be collected, since the amount of the capital stock cannot be considered as a liability of the bank in determining its solvency. R. D. Moore appears to have owned other bank stock and real estate, but for the most part the bank stock was pledged and the real estate mortgaged.

As stated above, the Bank of Portland had been carrying $40,000 of loans on second mortgage paper for a considerable period, without any reason on the part of the plaintiff in error to believe that any of this large sum could be collected until a change in agricultural condi-

tions should work an increase in farm land values. More than half the total assets of the bank, including the notes which were most likely to be solvent, had been pledged to secure $80,000 borrowed from other banks. This borrowed money, with the exception of approximately $10,000 in the vault of the bank on the morning of the day it ceased to do business, had been absorbed, and nothing had been done toward the reduction of the debt owing to the bank by its president. This circumstance seems to us to work strongly against the testimony of the plaintiff in error that he regarded his father as solvent and the debt as good for its face value.

After the withdrawal of $10,000 or $12,000 in deposits on October 4, 1926, the plaintiff in error agreed with the other directors that the bank could not continue to do business. So far as the record shows neither he nor any one else had any suggestion to make as to how additional cash could be secured with which to carry on the bank and avoid liquidation. With an aggregate total of $136,000 in deposits outstanding, it seems to us that the plaintiff in error must have anticipated the possibility of a reduction of $10,000 or $12,000, and must have known on the morning of October 4th that the bank was in such condition that a withdrawal of deposits of that amount would result in liquidation.

The plaintiff in error did not offer a line of evidence to indicate that he regarded any of the assets of the bank available for early reduction to cash. He does not define the term "solvent" in his testimony that he considered and believed the bank solvent at the time he received the deposit from Kerley on the morning of October 4. He does not explain his testimony by a showing that he had any reason to believe that any of the debts

of the bank could be collected when due. It is significant that none of his large debtors had any considerable amount of money on deposit, and a number of them were overdrawn. We are constrained to believe, therefore, that when the plaintiff in error testified that he thought his bank was solvent, he meant that it would probably be able to meet its obligations eventually, if permitted to continue in business until better conditions would permit land values to return to former levels. We find nothing on the record to justify a belief upon the part of the plaintiff in error that the bank could pay its depositors upon liquidation within a reasonable time.

The conditions with which the plaintiff in error was confronted on the morning of October 4, 1926, were that sums aggregating the total capital of the bank had been withdrawn by the president and owner of the capital stock, in the form of loans, and that these loans were not decreased, but were increased, while the bank was put to the necessity of pledging the greater part of its paper to secure loans made to it by other banks in the sum of $80,000, thus exhausting its ability to raise money without delay, to meet any unusual or heavy demands upon it. The plaintiff in error knew that none of the loans secured by second mortgages could be converted into cash unless after long delay, and he knew that the flour mill, crate factory and mercantile business, in which his brothers were interested, had little or no money on deposit and that they were heavy borrowers.

In *Gass* v. *State,* 130 Tenn., 581, 592, this court said that, in determining whether the accused had good reason to believe that this bank was solvent, it is necessary to inquire into the source of his knowledge and his duty to know the value of the bank's assets. The court

said: "If he is the one described in the act (Acts 1911, chapter 44) as 'having the control or management of any bank in this State,' it is his duty to keep up with the assets, and at all times to know their value as far as practicable by the exercise of due diligence."

In the course of the same opinion the court stated the principle underlying the statutory definition of the offense with which the plaintiff in error is charged, as follows:

"Safety is secured by requiring officers having the control or management of banks to keep closely in touch with the assets, and to have a reasonable knowledge of their value, and to refuse to receive deposits when they find they are not amply sufficient to pay all debts exclusive of capital stock, surplus, and undivided profits of stockholders. If a bank continues to do business when it is not solvent in this sense, and it receives deposits, it is guilty of negligence of so hazardous a character as to amount to positive fraud and criminal liability under the statute."

Notwithstanding the fact that R. D. Moore, as president and owner of the capital stock of the bank, exercised an active supervision over its affairs, the plaintiff in error, as cashier, was the officer required to attend and manage the business of the bank, and was equally in control with his father. It was, therefore, his duty to know the value of the bank's assets as far as practicable by the exercise of due diligence.

There is, however, no evidence that the plaintiff in error was not thoroughly familiar with the condition of the bank, as above recounted. The real issue of fact involved is whether, in view of the policy of the law embodied in the opinion of this court in *Gass* v. *State, supra,*

he can be relieved of criminal responsibility for receiving the deposit on the morning of October 4, upon his statement that he believed his bank was solvent.

The jury and trial judge have determined that the plaintiff in error was not justified in this belief, and that if he did in fact believe the bank to be solvent, it was because he closed his eyes to conditions which should have made the fact of insolvency obvious to him.

We are of opinion that the jury and trial judge were well warranted in concluding both that the condition of the bank was such that the plaintiff in error must have known that his bank could not continue to do business except in the event the future deposits should be largely in excess of the withdrawals, and that the solvency of the heavy debtors of the bank was so dependent upon the continued financial support of the bank as a going institution, that even a temporary suspension of the business of the bank would bring about their bankruptcy and destroy the value of the bank's assets. We have been able to find no tangible evidence in the record to which we could point as preponderating against the verdict and judgment of the jury and trial judge.

The assignments of error attacking the sufficiency of the evidence to sustain the conviction will, therefore, be overruled.

The indictment charged that the offense was committed by plaintiff in error by receiving a deposit of $466.42 from C. W. Kerley. The indictment did not charge that the money deposited was the property of C. W. Kerley, and the proof showed that the money was received by the plaintiff in error from C. W. Kerley and deposited to the credit of J. E. Kerley & Sons, a partnership, of which C. W. Kerley was a member.

The plaintiff in error moved to· quash the indictment because the ownership of the deposit was not stated therein, and on the motion for a new trial contended that there was a variance between the indictment and proof.

The two contentions are inconsistent. There could have been no variance unless the indictment had charged that the deposit was the property of ·C. W. Kerley, since the proof strictly followed the averments of the indictment, that the plaintiff in error received the deposit from C. W. Kerley.

The statute defining the offense does not make an intent to defraud an essential element of the offense. Therefore, we do not think it essential that the indictment should name the owner of the money received on deposit. It seems to us sufficient that the indictment identified the deposit received by naming the person from whom it was received at the bank, when such person was not a mere messenger but one who had rights of ownership in the money deposited. If the plaintiff in error had been charged with stealing this money from the cash drawer of the partnership, it would have been sufficient to charge the theft of the money as the property of one of the partners. *Chapple* v. *State,* 124 Tenn., 105, 113; *Lowry* v. *State,* 113 Tenn., 220·; Shannon's Code (all editions), sec. 7090. In view of these decisions and the statute cited, we could find no justification for holding the indictment ;in this case to a higher degree of certainty in the description of the offense than would be necessary in an indictment for larceny.

We find no error in the rulings of the trial judge upon the objections to the competency of evidence. We think the evidence as to the amount realized for the payment of debts on the property of the several manufac-

turing and business concerns, which were thrown into bankruptcy after the bank failure, was competent for the purpose of supporting the expression of opinion by the several witnesses that the paper of these concerns held by the bank was worthless or nearly so in October, 1926. *Gass* v. *State,* 130 Tenn., 581, 589-590. We can see no error in the refusal of the trial judge to permit the plaintiff in error to go further into the details of the refinancing of the Highland Rim Crate & Furniture Company. The evidence sufficiently showed that this business was refinanced after bankruptcy, and was carried on with new capital; but since this capital was procured upon the faith of mortgage upon property other than the plant itself, we think the details could have shed no light upon the value of the plant before the bank failure. Other rulings upon the admission or exclusion of evidence appear to be of minor importance, and we find no prejudicial error therein. We think the remarks of the trial judge, made in restricting the proof with regard to the refinancing of the crate factory, indicating that such evidence had "very indirect bearing" and "very remote bearing" upon the issues of the case, were necessary remarks, showing the reason for his ruling, and that no error appears therein.

▉ Complaint is made of the charge, in which the jury were instructed that the plaintiff in error should be held to have known the value of the assets of the bank in so far as he could have known them "by the exercise of due diligence."

This instruction was in the language used by this court in the quotation hereinabove made from *Gass* v. *State,* 130 Tenn., 592-593; and we think it was for the jury to determine what would amount to due diligence on the

part of the plaintiff in error, in connection with the instruction that it was the duty of the plaintiff in error to follow up and know the assets of the bank as far as practicable.

█ It is complained that the trial judge did not state the theory of the plaintiff in error, in his charge to the jury. The trial judge did not undertake to state either the theory of the State or the plaintiff in error, other than was necessary to present the issues involved. It has never been held that it is incumbent upon the trial judge to include in his charge a statement of the respective theories of the parties on the facts of the case, especially in the absence of a special request for such an instruction. There was no such request in this case.

█ We do not think it was improper for the district attorney-general, in his argument to the jury, to refer to the fact that none of the depositors had received anything from the liquidation of the bank's assets. Such fact was a legitimate argument for the proposition that the bank was in fact insolvent. It was improper for the attorney-general to refer to counsel as having been paid for their services, and, therefore, interested, while asserting his own lack of interest. The district attorney is, of course, no less a ''paid attorney'' than counsel who are employed to defend, and the acceptance of a consideration for legal services should not be referred to as discounting either the sincerity or good faith of counsel. However, we do not think this inadvertence of the attorney-general can be said to have been of such relative importance as to have affected the verdict, and we do not feel justified in awarding a new trial on that account.

█ The trial of the plaintiff in error was at the September term, 1928, of the trial court. At the September term, 1927, the plaintiff in error moved for a change of venue, and proof was heard by the trial judge as to the merits of the application. After hearing the evidence, the trial judge ruled that the prejudice against the plaintiff in error was confined to a portion of the county, and that the prejudice was not so general as to make it likely that a fair and impartial trial could not be held in the county. The evidence submitted to the trial judge was preserved by a bill of exceptions, and the ruling thereon is now assigned as error.

When the plaintiff in error went to trial a year later, without renewing his application for a change of venue, we think he waived his previous motion. There is no evidence to indicate that the witnesses offered by the plaintiff in error on this point would have testified to the same conditions as existing a year later, and there is no presumption that conditions were the same in September, 1928, as they were in September, 1927. We, therefore, find it unnecessary to review the ruling of the trial judge on this point.

We find no reversible error on the record, and the judgment of the circuit court will be affirmed.

Mr. Justice Cook does not concur in the conclusions herein reached.