IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 29, 2010

## STATE OF TENNESSEE v. TERRI K. TEASTER

**Appeal from the Criminal Court for Greene County**
**No. 07CR182      John F. Dugger, Jr., Judge**

---

**No. E2010-00413-CCA-R3-CD - Filed September 27, 2010**

---

A Greene County Criminal Court jury convicted the defendant, Terri K. Teaster, of vehicular assault, and the trial court imposed a sentence of four years' incarceration. In this appeal, the defendant contends that the evidence was insufficient to support her conviction, that the State improperly remarked on the defendant's right not to testify, and that the four-year, fully-incarcerative sentence is excessive. Discerning no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., delivered the opinion of the Court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Brent Hensley, Greeneville, Tennessee (on appeal); and Francis X. Santore, Jr., Greeneville, Tennessee (at trial and on appeal), for the appellant, Terri K. Teaster.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; C. Berkeley Bell, District Attorney General; and John Chalmers Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The defendant's vehicular assault conviction relates to a June 29, 2005 vehicle collision between the Pontiac Firebird being driven by the defendant and a van being driven by the 85-year-old victim on Blue Springs Parkway in Greene County.

At trial, Greene County Sheriff's Deputy Chuck Humphries testified that he was on patrol on June 29, 2005, when he was dispatched to a vehicle crash "on Blue Springs

Parkway, just past the Jetway Market." Deputy Humphries described the roadway at that location as "straight," with "[u]nlimited visibility both directions." He added that on the day of the collision, the roadway was dry and the weather was clear. He determined the victim to be the driver of a van and the defendant to be the driver of a maroon Pontiac Firebird.

Deputy Humphries recalled that after the defendant was taken from the scene by ambulance, he conducted an inventory search of her vehicle before it was removed from the scene and found two prescription pill bottles, "[t]wo small straws, a set of scales, and a knife." He also found scales that are commonly used to weigh marijuana. He then went to the hospital to interview the defendant, who, he said, "appeared . . . to be under the influence of alcohol or drugs." It was Deputy Humphries' opinion that "she was intoxicated." Upon a request by the deputy, the defendant agreed to take a blood test to determine whether she was under the influence of alcohol or other drugs. Deputy Humphries testified that the defendant's blood was drawn approximately one hour after the crash and that he immediately sent the sample to the Tennessee Bureau of Investigation for testing. Testing established the presence of Nordiazepam, Diazepam, Carisoprodol, and Meprobamate, which are prescription narcotics, and marijuana in the defendant's blood.

Deputy Humphries testified that he interviewed the defendant in April of 2006 and that she provided a written statement about the accident. He said,

> She wrote me a statement that she had gotten up that morning;
> brushed her teeth; combed her hair; talked to Ray's cousin for a
> few minutes; called Ray; and was going to Jetway to get
> cigarettes and two liter Pepsi; got in the car; left; pulled to a stop
> sign at Don Smith's; and can't remember after that.

He stated that "Don Smith's" was "west of the wreck scene, approximately three to four hundred yards."

During cross-examination, Deputy Humphries testified that he found no drug residue on the straws or the knife found in the defendant's car. He conceded that the toxicology report indicated that there was no alcohol in the defendant's system.

Joanne Bowman, daughter of the 85-year-old victim, testified that on June 29, 2005, she and her two youngest grandchildren spent the afternoon with the victim and followed her to a repair shop on Asheville Highway in Greeneville. Ms. Bowman said the victim had no problems driving and that she was in good health. After the victim's car was examined at the garage, they left to return to their home in Mosheim. Ms. Bowman testified that she "intended to pull out directly behind" the victim when they left the garage, but she

was unable to do so because of the heavy traffic. Ms. Bowman testified that as she approached the Jetway convenience store on Blue Springs Highway, she saw that the victim's vehicle had been hit "head-on" by another vehicle. Ms. Bowman said that her mother "was bleeding from the left side of her head, and there was blood all over the airbag, and she was just unresponsive at the time." Ms. Bowman stated that she went over to the other vehicle and asked the driver "was she all right." She testified that the defendant, Terri Teaster, was the only person in the vehicle.

Following the accident, the victim was taken to Laughlin Hospital by ambulance, and Ms. Bowman followed in a car driven by Tammy Morgan. Because the physicians at Laughlin Hospital were not prepared to deal with injuries as extensive as those suffered by the victim, she was transported by helicopter to Johnson City Medical Center, where she remained for 31 days. Ms. Bowman testified that the victim spent an additional two weeks at Northside Hospital and one month in a rehabilitation facility. The victim spent the bulk of her time in the Johnson City Medical Center confined to the Intensive Care Unit. Ms. Bowman described the victim's injuries, "She had a neck fracture. She had eight broken ribs. Hip, broken hip and pelvis. She had a severe cut on her left arm and her elbow. And a broken right leg." Ms. Bowman stated that her mother eventually required a total knee replacement that caused another two-week hospital stay.

During cross-examination, Ms. Bowman testified that the victim had previously broken her wrist and ankle, but she had had no major surgeries or other health problems. She said the victim took Coumadin, blood pressure medicine, and thyroid medicine and that the victim had been taking these medications for "years and years." She stated that the victim took her car to the garage because it "was like making a little noise or something." Ms. Bowman denied that the victim had trouble with her eyesight or driving ability. She stated that she did not make a habit of following the victim every time she drove but was doing so on the day of the collision because they happened to be together.

Doug Brown testified that on the day of the wreck, he was following a maroon, two-door Pontiac for several hundred yards and noticed that the car "wasn't in the lane." He testified that the car swerved off the shoulder of the road and across the center line. At the time the maroon car made impact with a van, the maroon car was across the center line. Mr. Brown stated that just before the crash he was worried the car would cause an accident. Following the collision, he "pulled over and just sat there."

The victim testified that she lived on Blue Springs Parkway in Mosheim and that on the day of the crash she "had been up to the car garage and was going back home" so that she could "go to church." She said she had no problems driving to the garage or back home until the collision occurred. She did not remember the collision itself. The victim

testified that as a result of the wreck, she "spent thirty-one days in Memorial Hospital in Johnson City, and then . . . three other places" before she was sent home. She stated that she "had to learn to walk and everything all over again." She recalled that "about every bone in [her] body was broken" and stated that she "can't do anything hardly" since the wreck.

Doctor Julie Dunn, a general surgeon and trauma surgeon who treated the victim during her stay at Johnson City Medical Center, described the victim's injuries:

> She had a closed head injury, which was consistent with blood in the brain.
> She had a C spine fracture, specifically it was odontoid fracture; it is sort of a pedicle that your head turns on to turn – it sits on to turn, and that was cracked.
> She had multiple rib fractures.
> She had bleeding into the chest that did require further surgery.
> She had a laceration to her spleen.
> She had acute blood loss anemia from all of her injuries.
> She had an acetabular fracture; that is the joint that the femur bone sits in. It's sort of a ball and socket. And she also had a tibial plateau fracture and that is the top of the tubular where the knee – the femur sits on top of that where the knee moves back and forth.

Doctor Dunn testified that most of the victim's fractures would have required eight to 12 weeks' healing time. She also stated that the victim's injuries would have been very painful and would have prevented her from resuming her daily activities for that period of time. The head injury, she said, could have lead to headaches and short- and long-term memory loss. She added, "At a woman at her age, with her medical condition, these are potentially lethal injuries."

Doctor Kenneth Ferslew, a pharmacologist and forensic toxicologist employed at East Tennessee State University's James H. Quillen College of Medicine, testified that he had reviewed the defendant's toxicology report along with her medical records from the day of the collision in order to determine whether the defendant was impaired by drugs or alcohol on the day of the crash. He stated that his analysis began with an examination of the defendant's negative blood alcohol level, which indicated that the defendant was either not drinking at or near the time of the accident or had been able to eliminate any alcohol in her system before the test was taken. In any event, Doctor Ferslew stated that he did not believe

that alcohol was an issue in this case because of the negative result, lack of the smell of alcohol on the defendant's person, and the fact that there was no alcohol in the defendant's car.

Doctor Ferslew then examined the other substances that were present in the defendant's system, and he described them for the jury in turn. He explained,

> Meprobamate is a skeletal muscle relaxant. It is a carbamate. It is sold under two trade names, Miltown or Equanil. It is an active metabolite of Carisoprodol. And Carisoprodol is a drug commonly known as Soma. It is a skeletal muscle relaxant. It is an analgesic. It is a central nervous system depressant. Some physicians, we use it as a sedative hypnotic. It is under the class carbamates. And it is used for headaches. It is used for muscle tension, muscle pain, and to calm people because it is a depressant.

He stated that "[w]hen the body metabolizes Carisoprodol, it produces Meprobamate." In this case, the defendant had both Carisoprodol and Meprobamate in her system, which, he said, "based on the prescribing patterns that occur," indicated that the defendant was "most likely . . . taking Soma and metabolizing it to Meprobamate." Doctor Ferslew testified that both drugs come with a warning that they will "impair your psychomotor performance or your ability to operate a motor vehicle or your ability to operate machinery. And that is because it is a central nervous system depressant."

Doctor Ferslew said that the level of Meprobamate in the defendant's blood was "in a therapeutic window" and that it would have been producing the desired effect of "C.N.S. depression and the muscle relaxation of a carbamate." He noted that even at a therapeutic level, the effects of Meprobamate "can be deleterious to your operating a vehicle." The level of Carisoprodol was "sub-therapeutic." Doctor Ferslew testified that the ratio of Meprobamate to Carisoprodol indicated that the defendant was "taking this drug chronically. In other words, repeated prior to this point in time." He added that chronically taking the drug does not necessarily mean that it was prescribed, it "goes back to just how often you are taking it." He stated that her total carbamate level was 19.7 and "[a]nytime the total carbamate is greater than 10, we know forensically, toxicologically, that this has been correlated with psychomotor impairment, misoperation of a vehicle, crashes." He said, "[T]herapeutic is what is desired. That does not mean that that concentration cannot have adverse effects. Because you were warned when you take many drugs that produce central nervous system depression, that even at therapeutic concentration, these drugs can impair you."

Doctor Ferslew testified that the defendant also tested positive for the use of "Diazepam, which is a generic name for Valium. It's a benzodiazepine. It is also a muscle relaxant. . . . They can be anti-epileptics, they can be minor tranquilizers, they can be axiolytics or drugs that calm people who have anxiety attacks." He stated that Diazepam is "metabolized to Nordiazepam." Again, he explained that the ratio of the drug and its metabolite indicated that the defendant "had been taking this stuff for a longer period of time prior." The benzodiazepines, like the carbamates, were within therapeutic levels. He stated that the defendant was "combining the drugs for an additive dissynergistic effect."

Doctor Ferslew testified that the defendant's medical records indicated that she suffered "no obvious head trauma" during the crash. Given the fact that the defendant crossed the center line, that she showed outward signs of intoxication, and that she had two different central nervous system depressants in her system, Doctor Ferslew concluded that the defendant "did show signs of impairment or intoxication in the misoperation of that vehicle." He added that the toxicology report also indicated that the defendant had used marijuana prior to the wreck, but he could not tell when she had done so. As a result, he could not say that the defendant was under the influence of marijuana at the time of the crash.

Based upon this evidence, the jury convicted the defendant of vehicular assault. The trial court imposed a sentence of four years's incarceration. The defendant filed a timely motion for new trial and a timely notice of appeal.

In this appeal, the defendant contends that the evidence is insufficient to support her conviction, that the State improperly commented on her failure to testify during closing argument, and that the sentence is excessive.

*I. Sufficiency of the Evidence*

The defendant asserts that the evidence was insufficient to support her conviction of vehicular assault because the State failed to establish that she was intoxicated at the time of the collision. The State asserts that the evidence adduced at trial fully supports the defendant's conviction. We agree with the State.

We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters*, 137 S.W.3d at 654.

-6-

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

Tennessee Code Annotated section 39-13-106 defines vehicular assault as follows:

> A person commits vehicular assault who, as the proximate result of the person's intoxication as set forth in § 55-10-401, recklessly causes serious bodily injury to another person by the operation of a motor vehicle. For the purposes of this section, "intoxication" includes alcohol intoxication as defined by § 55-10-408, drug intoxication, or both.

T.C.A. § 39-13-106(a) (2006). "'Serious bodily injury' means bodily injury that involves . . . [a] substantial risk of death; . . . [p]rotracted unconsciousness; . . . [e]treme physical pain; . . . [p]rotracted or obvious disfigurement; . . . [p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or . . . [a] broken bone of a child who is eight (8) years of age or less." *Id.* § 39-11-106(34).

The evidence adduced at trial established that on the day the defendant caused a head-on collision with the victim's vehicle, the defendant was under the influence of at least two central nervous system depressants. Doctor Ferslew testified that the effects of these medications, even at therapeutic levels, would have impaired the defendant's operation of her vehicle. He also stated that the overall level of each medication in the defendant's system established that the impairment caused by the medications contributed to her "misoperation" of her vehicle that day. Mr. Brown testified that the defendant was operating her vehicle in an erratic manner just before the collision. This evidence clearly supports the defendant's conviction of vehicular assault.

## II. Improper Closing Argument

The defendant next contends that during his closing argument, the prosecutor made an improper reference to the defendant's failure to testify or offer other evidence at trial and that the error cannot be classified as harmless given the "absence of proof" of the

defendant's guilt. The State argues that the prosecutor's remark was not improper and asserts in the alternative that any error was unintentional and that it was rendered harmless by the trial court's immediate curative instruction, and we agree.

During his closing argument, the prosecutor made the following remarks: "You have not heard one piece of evidence that says she wasn't intoxicated or under the influence. You've heard not one thing that says that she was being conscientious or careful." Defense counsel objected, and the trial court sustained the objection, stating, "Don't make any implications about her not testifying. She does not have to testify. The defendant is presumed innocent and does not have to present any proof." Later, during its general charge to the jury, the trial court provided the following instruction:

> A person accused of a crime is presumed to be innocent. This means that you must start with the presumption that the defendant is innocent. This presumption continues throughout the trial and entitles the defendant to a verdict of not guilty unless you are satisfied beyond a reasonable doubt that she is guilty.

> The defendant is not required to prove her innocence or to do anything. . . . The State must prove each element of the crime beyond a reasonable doubt. If you find the State has not proven every element beyond a reasonable doubt, then you must find the defendant not guilty.

> . . . .

> The defendant has not taken the stand to testify as a witness but you shall place no significance on this fact. The defendant is presumed innocent and the burden is on the State to prove her guilt beyond a reasonable doubt. She is not required to take the stand in her own behalf, and her election not to do so cannot be considered for any purpose against her, nor can any inference be drawn from such fact.

Trial courts have substantial discretionary authority in determining the propriety of final argument, but the trial court must restrict any improper argument. *Sparks v. State*, 563 S.W.2d 564, 569-70 (Tenn. Crim. App. 1978). Most restrictions during final argument are placed upon the State, based in great measure upon the role of the prosecutor in the criminal justice system:

> [The prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor – indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.
>
> It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none. . . .

*Berger v. United States*, 295 U.S. 78, 88 (1935). The State must refrain from argument designed to inflame the jury and should restrict its commentary to matters in evidence or issues at trial. More specifically, the prosecution is not permitted to reflect unfavorably upon defense counsel or the trial tactics employed during the course of the trial. *See Dupree v. State*, 410 S.W.2d 890, 891-92 (Tenn. 1967); *Moore v. State*, 159 Tenn. 112, 124, 17 S.W.2d 30, 35 (1929); *Watkins v. State*, 203 S.W. 344, 346 (Tenn. 1918); *McCracken v. State*, 489 S.W.2d 48, 50 (Tenn. Crim. App. 1972). Furthermore, "[a] prosecutor is strictly prohibited from commenting on the defendant's decision not to testify." *State v. Thacker*, 164 S.W.3d 208, 244 (Tenn. 2005) (citing *State v. Reid*, 91 S.W.3d 247, 297 (Tenn. 2002); *Coker v. State*, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995)).

To be sure, closing argument for both parties "must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried." *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978). To merit a new trial, however, the argument must be so inflammatory or improper as to affect the verdict. *Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965). When determining the propriety of closing argument, this court considers the following factors:

(1) The conduct complained of viewed in the context and in light of the facts and circumstances of the case[;]
(2) [t]he curative measures undertaken by the court and the prosecution[;]
(3) [t]he intent of the prosecutor in making the improper statements[;]
(4) [t]he cumulative effect of the improper conduct and any other errors in the record [; and]
(5) [t]he relative strength or weakness of the case.

*Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

Even if the prosecutor's remarks can be classified as a comment on the defendant's failure to testify or offer other evidence of her innocence, the record establishes that defense counsel offered a contemporaneous objection, that the trial court sustained the objection, and that the trial court specifically and immediately instructed the jury that the defendant was under no duty to prove her innocence. The trial court followed its curative instruction with a general charge that repeatedly emphasized the State's burden of proving the defendant's guilt beyond a reasonable doubt and that clearly directed the jury to make no inference from the defendant's failure to testify or offer proof. Under these circumstances, we cannot say that the very brief remarks had any effect on the jury's verdict. In consequence, the defendant is not entitled to relief on this issue.

*III. Sentencing*

In her final claim, the defendant challenges both the length and the manner of service of her sentence, arguing, "Because of the appellant's physical condition, she should have been sentenced to the minimum in her range – two years at 30% RED as a standard, Range I, offender – and, likewise, alternative forms of sentencing, such as house arrest, should have been implemented." The State asserts that because the defendant failed to make the transcript of the sentencing hearing a part of the record on appeal, this court must presume that the sentencing decision of the trial court was correct. We agree with the State.

The appellant bears the burden of preparing an adequate record on appeal, *see State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993), which includes the duty to "have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal," Tenn. R. App. P. 24(b). If the appellant fails to file an adequate record, this court must presume the trial court's ruling was correct. *See State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993). In the absence of the transcript of the sentencing

hearing, a de novo review of the defendant's sentence is impossible. *See* T.C.A. § 40-35-401(d) (2006) (requiring that appellate court conduct a de novo review of the sentencing decision of the trial court with a presumption that the determinations made by the trial court are correct). In consequence, we must presume that the sentencing decision of the trial court was correct.

*IV. Conclusion*

Because we discern no infirmity in either the conviction or sentence imposed, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE