IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 12, 2003 Session

## STATE OF TENNESSEE v. DOUGLAS MARSHALL MATHIS

**Appeal from the Circuit Court for Houston County**
**No. CR-4532     Robert E. Burch, Judge**

---

**No. M2002-02291-CCA-R3-CD - Filed January 30, 2004**

---

The defendant, Douglas Marshall Mathis, was convicted of first degree murder and sentenced to life imprisonment. In this appeal, he contends: (1) that the evidence is insufficient; (2) that the trial court erred by giving an irrelevant definition of "knowing" as a part of the instructions to the jury; (3) that the prosecutor's comments during closing argument were improper; (4) that he was denied the right to a fair and impartial jury; and (5) that the trial court erred by admitting certain evidence. Because the state's closing argument was improper and the error cannot be classified as harmless, the judgment of the trial court is reversed and the cause is remanded for a new trial.

**Tenn. R. App. P. 3; Judgment of the Trial Court Reversed**

GARY R. WADE, P.J., delivered the opinion of the court, in which DAVID G. HAYES, J., joined. JERRY L. SMITH, J., filed a concurring and dissenting opinion.

Jerred Creasy and Kirk Vandivort, Charlotte, Tennessee, for the appellant, Douglas Marshall Mathis.

Paul G. Summers, Attorney General & Reporter; Christine M. Lapps, Assistant Attorney General; Dan M. Alsobrooks, District Attorney General; and Carey J. Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In May of 2001, the defendant, charged with first degree murder, entered a plea of guilt to one count of second degree murder for the shooting death of the victim, Selwyn Ward. Later, he filed a petition for post-conviction relief and in September 2001 the post-conviction court granted a new trial.

During the trial, Kenneth Barnes, Sheriff of Houston County, testified that shortly before midnight on May 11, 1999, he received a report of a shooting at a campsite near the Magnolia Bridge. Upon his arrival, Sheriff Barnes found the body of the victim, Selwyn Ward, who had suffered a shotgun wound to the face. The victim's wife, Kim Ward, informed the Sheriff that the

defendant had shot the victim after an argument. Ward admitted that she and her son, Cody Lucas, had moved the victim's body after the shooting.

While at the crime scene, Sheriff Barnes learned that the defendant, whom he had known for thirty years, had reported to the sheriff's department and wanted to make a statement. Because he was ill with the flu, the Sheriff was unable to participate in the entire interview but did recall that the defendant, who did not appear to be intoxicated, had claimed that the victim had brandished a weapon during their argument. During the questioning, the defendant acknowledged that he had thrown the murder weapon into the river.

Darrell Allison of the Houston County Sheriff's Department, the first officer to arrive on the scene, found that the victim was dead. At trial, he testified that he did not find any weapons at the scene. Later, Officer Allison learned that the defendant had admitted the shooting and told investigators that he had thrown the gun, which was never found, into a stream. Although Deputy Allison did not conduct an interview, he recalled that the defendant remarked, "Darrell, you . . . know I didn't mean to hurt this man."

David Hicks, criminal investigator for the Houston County District Attorney's Office, participated in the investigation. When he arrived at the crime scene, Hicks observed the shotgun wound to the victim and, along with Agent Joe Craig of the Tennessee Bureau of Investigation (TBI), interviewed the victim's wife and stepson. Hicks noted that there was a large pool of blood in front of a lounge chair near the campfire and that the victim's body had been moved. He testified that no weapons were found at the scene.

Hicks and Agent Craig also interviewed the defendant, who had turned himself in to the Houston County Sheriff's Department. According to Hicks, the defendant had been drinking but was not drunk. He recalled that the defendant claimed that he had gotten into an argument with the victim, who had then "gone to his tent and came back with a gun or what appeared to be a gun." Hicks maintained that it was the defendant's contention that he had backed up as far as he could and was in danger when he shot the victim. After questioning the defendant's brother, Hicks informed the defendant that he had received a conflicting account of the shooting and the defendant then admitted that the victim may not have had a weapon. According to the officer, the defendant acknowledged taking a twelve-gauge shotgun from under the seat, loading it with one six shot shell, positioning the barrel across the window, and firing one shot.

The victim's wife, Kim Ward, testified that her family had gone camping near Magnolia Bridge on the day of the murder. She recalled that shortly after 10:30 p.m., the driver of a large blue car paused on the bridge and then drove toward their campsite. When the car stopped near their campsite, two men got out and one announced, "It's Marshall Mathis and my brother Jeff." According to Ms. Ward, the victim then said, "[Y]our brother, Jeff, he's the one that sold my sixteen-year-old . . . son narcotics," to which the defendant replied, "[Y]ou're making a mistake." Shortly thereafter, Ms. Ward heard "a loud boom" and then saw the victim roll off of his chair and onto the ground. It was her opinion that the victim died within a few seconds. Ms. Ward testified that she

sent her son, Cody Lucas, for help while the defendant and his brother sped away. She contended that the victim was unarmed at the time of the shooting.

During cross-examination, Ms. Ward admitted that she did not see who fired the shot that killed the victim. While she was unable to identify the defendant as the driver of the car, she maintained that she saw his arm extending outside of the driver's side window. She conceded, however, that she did not see a gun. Ms. Ward acknowledged that the distance from where the defendant's car stopped to where the victim was sitting was approximately forty-three feet. She also remembered that the defendant had stated that he was drunk. Ms. Ward explained that after the shooting, she and her son, Cody, had moved the body because the victim's feet were too close to the fire.

Cody Lucas, the victim's stepson, testified that he had been expelled from school shortly before the shooting because he had taken Valium to school. He claimed that he acquired the pills from the defendant's brother, Jeff Mathis, and that the victim was upset about the incident. He recalled that on the day of the shooting, the family had awakened early, gathered their camping gear, and driven to White Oak Creek for a day of fishing and swimming. Lucas testified that when he returned to his tent at approximately 10:45 p.m., the victim and his mother were sitting by the fire. He stated that he had only slept for about fifteen minutes when he heard a gunshot. He remembered that when he stepped out of his tent, he saw "a car taking off at the top of the driveway and my dad laying there and my mom crying." Lucas recalled that he drove the family van to a nearby residence to telephone 911.

Kimberly Agee, a friend of the victim, testified that she and her children had joined the victim and his children at the campsite on the day of the murder. She recalled that the children played and swam in the creek while the defendant caught fish for the evening meal. According to Ms. Agee, the victim was "laid back in his recliner or lounge chair by the camp fire, just relaxing" when she left the campsite at approximately 10:45 p.m. She testified that she saw no gun in the victim's possession.

Jeff Mathis, the defendant's brother, testified that he and the defendant had traveled to Waverly on the evening of the shooting and, as they returned home, had to cross Magnolia Bridge. He recalled that when they reached the bridge, the defendant first directed him to stop the vehicle and then asked him to drive down to the creek. He stated that when they arrived at the campsite, the defendant identified himself to the victim, explaining that his brother was with him, at which point the victim replied, "[Y]our little brother, Jeff, has sold my sixteen-year-old son some cocaine." Jeff Mathis testified that an argument ensued and the defendant, who was sitting in the passenger seat, pushed him out of the way and shot the victim with a sawed-off, twelve-gauge shotgun. According to Jeff Mathis, the defendant remarked, "[I]f I had another gun or could get this shell out, . . . I'd kill her and him, too." Jeff Mathis testified that he drove the defendant to the residence they shared with their parents and the defendant shouted, "Daddy, get up, . . . I've killed a man[!]"

During cross-examination, Jeff Mathis conceded that he had initially claimed that the defendant was unarmed on the day of the shooting, explaining that he had done so because he was on parole at the time. He also acknowledged that the victim sounded angry when he accused him of selling drugs to his son and that he was scared because "[y]ou can't ever tell what a man's got when he's camped out." Jeff Mathis testified that the defendant did not take aim before shooting the victim and simply fired out the window of the car.

Before the Sheriff arrived to question the defendant, J.T. Baggett, a member of the Drug Task Force in Houston County, stood guard. Officer Baggett testified that the defendant was on the front steps of the police station when he arrived and appeared to be nervous. While the officer did not participate in the interview of the defendant, he recalled that the defendant claimed that he did not intend to shoot the victim and that he had done so in self-defense. He also heard the defendant acknowledge that he would have to "face the consequences of going to jail for his actions." Baggett testified that the defendant did not appear to be intoxicated.

TBI Agent Joe Craig testified that the defendant initially claimed self-defense, maintaining that the victim had walked out of his tent with something in his hand that resembled a gun. The agent recalled that when the defendant was confronted with the contradictory statement given by his brother, he stated that the victim had been sitting in the chair when they arrived and appeared to have something in his hands. According to Agent Craig, officers from the Tennessee Highway Patrol lowered a camera into the river at the location where the defendant claimed to have disposed of the gun but were unable to locate the weapon. He explained that the current was too strong to permit divers to go into the area to search.

During cross-examination, Agent Craig acknowledged that during his investigation, he failed to discover any previous conflicts between the defendant and the victim. He recalled that the defendant had insisted that the only reason he traveled to the camp site at Magnolia Bridge was to "sleep off" the alcohol he had drunk earlier in the evening, implying a chance meeting with the victim. Agent Craig also agreed that there were no holes in the lounge chair where Ms. Ward claimed that the victim had been sitting at the time of the shooting. He acknowledged that he was unable to conclusively determine whether the victim was standing or seated when he was shot.

Dr. Charles Harlan, who performed the autopsy, testified that the cause of death was a shotgun wound. He found pellet wounds from the victim's shoulders to his head and determined that some of the pellets from the shotgun blast had altogether missed the victim, suggesting the lack of a precise aim. Dr. Harlan was unable to find wadding in any of the wounds, indicating that the shot was not fired from an especially close range.

I

Initially, the defendant challenges the sufficiency of the evidence for a first degree murder conviction, arguing that the state failed to establish the element of premeditation. On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

First degree murder is described as:

(1) A premeditated and intentional killing of another;

(2) A killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy; or

(3) A killing of another committed as a result of the unlawful throwing, placing or discharging of a destructive device or bomb.

Tenn. Code Ann. § 39-13-202(a) (Supp. 1999). Tennessee Code Annotated section 39-13-202(d) provides that:

[P]remeditation is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d) (1997). Whether the evidence was sufficient depends entirely on whether the state was able to establish beyond a reasonable doubt the element of premeditation. See State v. Sims, 45 S.W.3d 1, 7 (Tenn. 2001); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

Our supreme court has held that the presence of premeditation is a question for the jury and may be inferred from the manner and circumstances of the killing. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000); State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Moreover, it is well-established that premeditation may be proved by circumstantial evidence. See, e.g., State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). Our high court has identified a number of circumstances from which the jury may infer premeditation: (1) the use of a deadly weapon upon an unarmed victim; (2)

the particular cruelty of the killing; (3) the defendant's threats or declarations of intent to kill; (4) the defendant's procurement of a weapon; (5) any preparations to conceal the crime undertaken before the crime is committed; (6) destruction or secretion of evidence of the killing; and (7) a defendant's calmness immediately after the killing. See State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); Pike, 978 S.W.2d at 914-15. This list, however, is not exhaustive and serves only to demonstrate that premeditation may be established by any evidence from which the jury may infer that the killing was done "after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d); see Pike, 978 S.W.2d at 914-15; Bland, 958 S.W.2d at 660.

One learned treatise states that premeditation may be inferred from events that occur before and at the time of the killing:

> Three categories of evidence are important for [the] purpose [of inferring premeditation]: (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, planning activity; (2) facts about the defendant's prior relationship and conduct with the victim from which motive may be inferred; and (3) facts about the nature of the killing from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

2 Wayne R. LaFave, Substantive Criminal Law § 14.7(a) (2d ed. 2003) (emphasis in original).

Here, the proof at trial established that once at the campsite, the defendant had an unpleasant exchange of words with the victim. There was no proof of planning activity or any particular motive. While there was no indication that the defendant procured the shotgun for the purpose of confronting the victim, he did admit in his statement to police that he took time to reach for the gun, load it, and aim in the direction of the victim. Although he claimed to police that he did so only to scare the victim or to defend himself, the jury was free to infer otherwise. Further, Jeff Mathis testified that after shooting the victim in the face, the defendant remarked that he would kill Ms. Ward if he had an additional shell, possibly implying an intent to have caused harm to the victim. Finally, the defendant hurriedly left the scene before the incident was reported to the Sheriff and disposed of the murder weapon by throwing it into a river. Taken in the light most favorable to the state, there was by a thin margin sufficient evidence to support a finding of premeditation.

II

The defendant next asserts that the trial court erred by providing an irrelevant definition of "knowing" in its instructions to the jury. The state asserts that the issue is moot because the defendant was convicted of first degree murder.

The trial court has a duty "to give a complete charge of the law applicable to the facts of a case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986); see also Tenn. R. Crim. P. 30. "[The] defendant has a constitutional right to a correct and complete charge of the law." State v. Teel, 793

S.W.2d 236, 249 (Tenn. 1990). Our law requires that all of the elements of each offense be described and defined in connection with that offense. See State v. Cravens, 764 S.W.2d 754, 756 (Tenn. 1989). Jury instructions must, however, be reviewed in the context of the overall charge rather than in isolation. See Sandstrom v. Montana, 442 U.S. 510 (1979); see also State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). A charge is prejudicial error "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). Any omission in the instructions in reference to an element of the offense which might lessen the burden of proof placed upon the state is constitutional error and requires a new trial unless the error is harmless beyond a reasonable doubt. State v. Walker, 29 S.W.3d 885, 893-94 (Tenn. Crim. App. 1999).

In State v. Page, 81 S.W.3d 781 (Tenn. Crim. App. 2002), a panel of this court held that because second degree murder is a result-of-conduct offense, the trial court erred by including the nature-of-conduct and nature-of-circumstances[1] definitions of knowingly in its charge to the jury. Further, the panel determined that the error could not be classified as harmless beyond a reasonable doubt because the defendant's mental state was a contested issue at trial. Id. at 789-90.

As indicated, the defendant was convicted of first degree premeditated murder, which requires a determination by the jury that he acted intentionally. In State v. Hill, 118 S.W.3d 380 (Tenn. Crim. App. 2002), the defendant, who was convicted of first degree murder, complained that the trial court erroneously provided the nature-of-conduct definition of intentionally. A panel of this court concluded that the trial court should not have provided the nature-of-conduct definition of intentional because first degree premeditated murder, like second degree murder, is a result-of-conduct offense. The panel ruled, however, that because the defendant had been convicted of first degree murder, which requires a finding that the defendant acted with premeditation, the error could be classified as harmless beyond a reasonable doubt. Id. at 386.

By its verdict, the jury in this instance concluded that the defendant acted with premeditation. That is to say that he displayed a previously formed design or intent to kill. See State v. West, 844 S.W.2d 144, 147 (Tenn. 1992); Hill, 118 S.W.3d at 386. Implicit in a finding of premeditation is that it was the defendant's desire to cause the result of his conduct, i.e., the death of the victim. Because the jury determined that the defendant acted with the design to kill, it is our view that the inclusion of the nature-of-conduct definition of intentional would be harmless beyond a reasonable doubt. See Hill, 118 S.W.3d at 386. Additionally, it is our view that a finding of premeditation encompasses a finding that the defendant acted knowingly. In consequence, any error with regard to the definition of knowing would qualify as harmless beyond a reasonable doubt. See id.; see also Page, 81 S.W.3d at 789.

---

[1]"[A] person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." Tenn. Code Ann. § 39-11-302(b).

### III

Next, the petitioner claims that the prosecutor's closing argument was improper. Specifically, he argues that the state improperly vouched for the victim's wife, Ms. Ward, and law enforcement witnesses, interjected personal opinion in violation of commonly known guidelines, and made inappropriate comments specifically designed to appeal to passion and caprice rather than logic, reason, or performance of civic duty. The state submits that the defendant has waived this issue by failing to make a contemporaneous objection or raise the error in a motion for new trial. In the alternative, the state asserts that the argument was not improper and that, even if some of the comments might be deemed inappropriate, they had no effect on the outcome of the trial.

Initially, the state correctly points out that the defendant did not object during the prosecutor's closing argument and did not raise the issue of improper argument in a motion for new trial. Appellate relief is generally not available when a party has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error." Tenn. R. App. P. 36(a); see State v. Killebrew, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (waiver applies when the defendant fails to make a contemporaneous objection); see also State v. Jenkins, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987); State v. Rhoden, 739 S.W.2d 6, 11-12, 18 (Tenn. Crim. App. 1987). Whether properly assigned or not, however, this court may consider plain error upon the record under Rule 52(b) of the Tennessee Rules of Criminal Procedure. State v. Ogle, 666 S.W.2d 58 (Tenn. 1984).

Before an error may be so recognized, it must be "plain" and must affect a "substantial right" of the accused. The word "plain" is synonymous with "clear" or equivalently "obvious." United States v. Olano, 507 U.S. 725, 732 (1993). Plain error is not merely error that is conspicuous, but especially egregious error that strikes at the fairness, integrity, or public reputation of judicial proceedings. See State v. Wooden, 658 S.W.2d 553, 559 (Tenn. Crim. App. 1983). In State v. Adkisson, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994), this court defined "substantial right" as a right of "fundamental proportions in the indictment process, a right to the proof of every element of the offense and . . . constitutional in nature." In that case, this court established five factors to be applied in determining whether an error is plain:

(a) The record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused [must not have waived] the issue for tactical reasons; and
(e) consideration of the error must be "necessary to do substantial justice."

Id. at 641-42. Our supreme court characterized the Adkisson test as a "clear and meaningful standard" and emphasized that each of the five factors must be present before an error qualifies as plain error. State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000).

Initially, the record contains the entire transcript of the trial, including the closing arguments. While defense counsel did not present as a ground for relief in the motion for new trial any

-8-

prosecutorial misconduct in closing argument, the issue was raised on appeal and the defendant has asked this court to consider the issue under the plain error doctrine. Both the state and the defense have addressed the merits of the issue in their respective briefs. Secondly, this court is guided by well-established and unequivocal rules governing the content of closing argument. A breach of these rules may warrant a new trial. See, e.g., State v. Cribbs, 967 S.W.2d 773, 786 (Tenn. 1998); State v. Keen, 926 S.W.2d 727, 736 (Tenn. 1994); State v. Stephenson, 878 S.W.2d 530, 541 (Tenn. 1994); State v. Thornton, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); Lackey v. State, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978). Third, improper or inflammatory comments during closing argument infringe upon a defendant's right to a fair and impartial jury, a jury guided by reason and logic rather than passion or caprice. Fourthly, the record gives no indication that the failure to object qualified as a strategy of defense. Finally, it is our view that analysis of this issue under the plain error doctrine is necessary in this case to do substantial justice because the proof of an essential element of the crime is particularly close. As indicated, the evidence of premeditation, while marginally sufficient, was not overwhelming. In consequence, the prejudicial effect of an improper closing argument would be greater than in a case where there is more than sufficient proof of the defendant's guilt. See, e.g., Judge v. State, 539 S.W.2d 340, 345 (Tenn. Crim. App. 1976) ("While the evidence here preponderates in the State's favor on appeal, this case was a very 'close' one at trial when viewed by the reasonable doubt standard. Therefore, the prejudicial impact of the statement on the jury is likely to have been greater than it would have been had evidence of defendant's guilt been overwhelming.").

Trial courts have substantial discretionary authority in determining the propriety of final argument. Although counsel is generally given wide latitude, courts must restrict any improper argument. Sparks v. State, 563 S.W.2d 564 (Tenn. Crim. App. 1978). Generally speaking, closing argument "must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried." State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978). For example, our supreme court has ruled that argument that "that defense counsel was 'trying to throw sand in the eyes of the jury' and 'blowing smoke in the face of the jury'" is improper argument. State v. West, 767 S.W.2d 387, 395 (Tenn. 1989). To merit a new trial, however, the argument must be so inflammatory or improper as to affect the verdict. Harrington v. State, 215 Tenn. 338, 385 S.W.2d 758 (1965). In Judge v. State, this court articulated the factors to be considered in making that determination:

> (1) the conduct complained of viewed in the context and the light of the facts and circumstances of the case;
> (2) the curative measures undertaken by the court and the prosecution;
> (3) the intent of the prosecutor in making the improper statements;
> (4) the cumulative effect of the improper conduct and any other errors in the record; and
> (5) the relative strength or weakness of the case.

539 S.W.2d at 344.

Most restrictions during final argument are placed upon the state. That is based in great measure upon the role of the prosecutor in the criminal justice system:

> [The prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the two fold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor, indeed he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. It is fair to say that the average jury, in a greater or lesser degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and especially assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

Berger v. United States, 295 U.S. 78, 88 (1935); see also Judge, 539 S.W.2d at 344-45. Thus, the state must refrain from argument designed to inflame the jury and should restrict its commentary to matters in evidence or issues at trial. The prosecutor must not express a personal belief or opinion, but whether that qualifies as misconduct often depends upon the specific terminology used. For example, argument predicated by the words "I think" or "I submit" does not necessarily indicate an expression of personal opinion. United States v. Stulga, 584 F.2d 142 (6th Cir. 1978). The prosecution is not permitted to reflect unfavorably upon defense counsel or the trial tactics employed during the course of the trial. See Dupree v. State, 219 Tenn. 492, 410 S.W.2d 890 (1967); Moore v. State, 159 Tenn. 112, 17 S.W. 30 (1929); Watkins v. State, 140 Tenn. 1, 203 S.W. 344 (1918); McCracken v. State, 489 S.W.2d 48 (Tenn. Crim. App. 1972). Although there may be no commentary on the consequences of an acquittal, the prosecution may point out the gravity of a particular crime and emphasize the importance of law enforcement. See State v. Dakin, 614 S.W.2d 812 (Tenn. Crim. App. 1980); Bowling v. State, 3 Tenn. Crim. App. 176, 458 S.W.2d 639 (1970).

This court has observed that there are five generally recognized areas of prosecutorial misconduct related to closing argument:

> 1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.
> 2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.
> 3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.

4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.

5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (citations omitted).

In this instance, the prosecutor, on more than one occasion did, in fact, express a personal opinion as to the veracity of the witnesses:

This whole issue about whether the Ward family had a gun at the creek, they didn't have a gun. She didn't lie about that. Bless her heart, she told the truth.

*          *          *

[Jeff Mathis] is no-count. Don't believe anything that he says unless it is corroborated and supported by the other evidence.

*          *          *

Now, Jeff is no-count. He has a criminal record as long as your arm and has been in jail. You can believe the parts of his testifying that are corroborated by the other evidence.

*          *          *

You can be proud of law enforcement in this case. Everyone has been well-represented in this case. David Hicks and the sheriff's department and all of these people, they put the facts in this case together and did not let any evidence get away from this case. There is not one iota of proof of any negligence on the part of Houston County in this investigation. They did their jobs. They got their man. They brought you the evidence in this case. They are a good crew to work with. You can be proud of your department in law enforcement in this case.

(Emphasis added.) The statements made regarding the testimony of Ms. Ward and the investigation conducted in this case amounted to improper vouching. Although the endorsement of the testimony of Jeff Mathis was less than resounding, the prosecutor did personally endorse this corroborated testimony. Expressions of personal opinion by the prosecutor are generally prohibited as a form of unsworn, unchecked testimony which tends to exploit the influence of the prosecutor's office and undermine the objective detachment that should separate a lawyer from the advocated cause. See Lackey, 578 S.W.2d at 107. In Thornton, 10 S.W.3d at 235, this court ruled that comments by a prosecutor that he was "very proud" of the crime lab and that "they do an excellent job" was improper argument. The prosecutor should not have expressed his personal opinion about Ms. Ward's or Jeff Mathis' veracity or credibility and should not have commented on the effectiveness of the law enforcement investigation of the crime. Although the defendant admitted shooting the victim, the degree of homicide, especially as between first and second degree murder, was a

significant issue at trial and the determination depended in large measure on the credibility of Ms. Ward and the investigating officers.

Further, the prosecutor made several statements during closing argument which appear to have been designed to arouse the passions of the jury and to stigmatize defense counsel:

> In desperation, the [defense] lawyers suggest that Ms. Ward would tell something other than the truth about the events that caused the death of her husband that night.
> It's offensive to suggest that this son that ran for help as his father lay bleeding on the ground, to suggest that he was in some way involved in a conspiracy to kill - - cover up this crime. How dare you?
> How dare you suggest that this family was involved in some kind of sham and has lied to this jury? How dare you? It's a shame that that's happened in this trial. It didn't have to happen.
>
>     \*             \*            \*
>
> What in the world did Selw[y]n Ward do in this case that contributed in any was to his death. The only thing that he did was to sit up in his chair, confront two (2) woolly boogers coming out of the night.
>
>     \*             \*            \*
>
> You know, there's a part of me that wishes he had had a gun that day. That he had a gun and he had picked it up and shot this guy and we wouldn't have to be here today. Because she would have had every - - Under the law, she would have every right - - every legal right to defend her family down there.
>
>     \*             \*            \*
>
> Now it's not okay to use a sawed-off shotgun or carry a sawed-off shotgun. Who carries a sawed-off shotgun under the seat of a car? And why did Marshall Mathis have that with him? What sort of man is he to saw the barrel - - to saw a - - saw a shotgun off? There's only one thing. This is a sawed-off shotgun. There's only one thing in life that a sawed-off shotgun is made for, that's to hurt people.
>
>     \*             \*            \*
>
> In this case, the only interested party in this case is Marshall Mathis, because he is trying to find a way out of this case through his lawyers.
>
>     \*             \*            \*
>
> It is first degree, particularly when you take the other facts of the other witnesses, through the defendant's own statement and his no-count brother, Jeff, who is a thief.
> [Jeff Mathis] has been in jail for thievery. [Jeff Mathis] was on parole that night when this happened.

(Emphasis added.)

In our view, these comments qualified as improper argument. Two, three, and possibly four of the prohibited areas were breached by the prosecution. See Goltz, 111 S.W.3d at 6. Moreover,

even if the victim had a perfect right to have defended himself under these circumstances, it was undignified and intemperate for the prosecutor to suggest that the defendant should have been shot. Finally, in the final argument by the state, the prosecution speculated upon the content of the instructions which the trial court intended to provide to the jury at the conclusion of the case. In Smith v. State, 626 S.W.2d 283, 285 (Tenn. Crim. App. 1981), this court observed that "[i]t is the province of the trial judge to state to the jury the law of the case, and it is not always advisable to counsel to do so in final argument because of the possibility of error in their summation." While references to the law during argument are fairly common place and while, standing alone, the reference made by the prosecution to the law in this case would not have been a basis for relief, there was an inadvertent misstatement, later repeated by the trial judge (and addressed in the previous section of this opinion), as to the application of the "nature of the conduct" definition of intentional.

In summary, the margin of proof in this case supporting a first degree, rather than a second degree, murder conviction was narrow. The primary source of evidence of premeditation came from the defendant's own statement to police.[2] See Judge, 539 S.W.2d at 344 (in determining whether improper argument had an effect on the verdict, an appellate court should consider the relative strength or weakness of the case). Our supreme court has held that "the line between harmless and prejudicial error is in direct proportion to the degree . . . by which proof exceeds the standard required to convict." Delk v. State, 590 S.W.2d 435, 442 (Tenn. 1979). Further, that the improper comments were made so often, and in fact comprised the major portion of the state's rebuttal argument, suggests intentional rather than neglectful conduct. See Judge, 539 S.W.2d at 344. Of equal importance is that neither the trial court nor the state undertook any measures designed to cure the prejudicial effect of the improper argument. See id. Under these circumstances, it is our view that the comments made during the state's closing argument were so improper that they cannot be classified as harmless. See Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a).

Because the error cannot be classified as harmless and in recognition of the considerable burden on the prosecution to refrain from improper methods of argument, it rises to the level of plain error. See Tenn. R. Crim. P. 52(b); Smith, 24 S.W.3d at 282-83. That is to say that it strikes at the fairness, integrity, and public reputation of judicial proceedings. See Wooden, 658 S.W.2d at 559. Accordingly, a new trial is warranted. See Harrington, 385 S.W.2d at 759.

IV

The defendant contends that he was denied the right to a fair and impartial jury, see U.S. Const. Art. VI, because the jurors were permitted to see and interact with the victim's children. Initially, the defendant has failed to support this issue with argument or citation to authorities. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); see also Tenn. R. App. P. 27(a)(7); State v. Hammons, 737 S.W.2d 549, 552 (Tenn. Crim. App. 1987). Accordingly,

---

[2]Although it has no bearing on our decision in this case, that the defendant had initially entered into a negotiated plea agreement for second degree murder suggests that both the state and the defense had reservations about the proof of premeditation.

the defendant has waived our consideration of this issue. Further, the defendant is not entitled to relief.

The record established that the state initially requested that the children be permitted to sit in the audience and observe the trial. The trial court granted the request but stated that it would grant a mistrial if the jury's attention was, in any way, drawn to the children. The state then decided that the children should not be present in the courtroom and sent them into the hall to await transportation from the courthouse. They sat on the stairs just outside the door used by the jury to exit the courtroom. There was no proof that the state intentionally placed the children on the stairs to garner sympathy from the jury. Moreover, there is absolutely no evidence that the jury was made aware that the children were those of the victim or that the jury interacted with the children at any time. In consequence, the defendant is not entitled to relief.

V

Finally, the defendant cites a number of errors with regard to the sawed-off shotgun admitted for demonstrative purposes. Specifically, he claims that the shotgun should not have been admitted for any purpose and that the trial court erred by using the term "murder weapon" when explaining the purpose of the admission of the weapon to the jury.

At trial, the state sought admission of a sawed-off shotgun procured from the TBI crime lab for demonstrative purposes, arguing that it was important for the jury to see how the weapon was broken and how it was loaded. The defendant objected, stating that the mechanics of a weapon other than that used in the shooting was irrelevant. The trial court admitted the shotgun for demonstrative purposes only. The admission of demonstrative evidence is within the sound discretion of the trial court. State v. West, 767 S.W.2d 387 (Tenn. 1989); State v. Delk, 692 S.W.2d 431 (Tenn. Crim. App.1985); State v. Wiseman, 643 S.W.2d 354, 365 (Tenn. Crim. App. 1982). In our view, the trial court did not abuse its discretion in admitting the weapon. Moreover, the trial court instructed the jury that the shotgun was not that used in the shooting and was to be used only for demonstrative purposes. The jury is presumed to follow the instructions of the court. See State v. Smith, 893 S.W.2d 908, 914 (Tenn. 1994); State v. Woods, 806 S.W.2d 205, 211 (Tenn. Crim. App. 1990). Thus, any error would qualify as harmless. See Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a).

The defendant correctly points out that the trial court used the term "murder weapon" in its instructions to the jury regarding the admission of the shotgun. When the error was brought to the court's attention, however, it issued an immediate curative instruction. As indicated, this court will presume that the jury followed the instruction. See, e.g., Smith, 893 S.W.2d at 914. The error would be harmless.

In summary, the evidence supporting the element of premeditation is sufficient. Because the prosecutor's comments during closing argument were improper, and because the error does not qualify as harmless, however, the defendant's conviction is reversed, a new trial granted, and the cause remanded.

_____
GARY R. WADE, PRESIDING JUDGE