# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### August 11, 2004 Session

## STATE OF TENNESSEE v. GARNER DWIGHT PADGETT

**Appeal from the Criminal Court for Putnam County**
**No. 01-0450     Leon Burns, Jr., Judge**

---

### No. M2003-00542-CCA-R3-CD - Filed October 21, 2004

---

The defendant, Garner Dwight Padgett, was convicted of first degree premeditated murder. The trial court imposed a sentence of life imprisonment. In this appeal of right, the defendant contends that the trial court erred by failing to grant a mistrial after two jurors observed him in custody, by failing to instruct on the lesser included offenses of aggravated assault and assault, and by failing to suppress his confession. He also challenges the sufficiency of the evidence and argues that there was prosecutorial misconduct during closing argument. The judgment of the trial court is affirmed.

### Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed

GARY R. WADE, P.J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

David Brady, District Public Defender, and John B. Nisbet, III, Assistant Public Defender, for the appellant, Garner Dwight Padgett.

Paul G. Summers, Attorney General & Reporter; Richard H. Dunavant, Assistant Attorney General; William E. Gibson, District Attorney General; and David A Patterson, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The twenty-six-year-old victim, Matthew Eric Smith, who lived with his parents in Cumberland County, was last seen alive at approximately 7:00 p.m. on Friday, March 2, 2001. Several days later, the victim's father, Frank Smith, saw the victim's vehicle, a red convertible Mustang, being driven by a woman later identified as Vicki[1] Eldridge, the wife of the defendant. The family reclaimed the vehicle six days after the victim's disappearance and on the next day, Sharon Smith, the victim's mother, reported to the authorities that the victim was missing.

---

[1]Her name also appears in the record spelled "Vicky."

The body was discovered in a remote wooded area known as Glade Creek. Officers found two .22 shell casings near the body and a bullet embedded in the left side of the victim's jacket hood. During the course of the investigation, TBI Agent Bob Krofssik questioned the defendant. After making several conflicting claims, the defendant acknowledged having lied to the agent and confessed to the murder. The defendant admitted having stolen a .22 caliber Browning pistol from Steve Golden approximately two weeks before the shooting. He stated that he met the victim at Vicki Eldridge's trailer on a Saturday night and initially introduced himself as her cousin. The defendant recalled that the victim, who never identified himself, told him that "Vicky had his damn car and was out running around" and complained that he had been abandoned in the woods by "one of the Robbins boys." The defendant informed the officer that he and the victim had smoked some methamphetamine from a pipe and that he later drove Ms. Eldridge's truck as the victim provided directions to "some [more methamphetamine] stashed in the woods." The defendant told the agent that the victim, who claimed to be having a sexual relationship with Ms. Eldridge, "dogg[ed]" her and described her as a "whore." The defendant contended that when he then informed the victim that he was Ms. Eldridge's husband so that "he would shut up about Vicky," the victim continued to "talk[] bad" about her. According to the defendant, the two men got out of the truck and the victim "kick[ed] leaves around" and "bent over at the waist" to look for the drugs. The defendant informed the officer that he got "spooked," pulled the gun from his belt, and then shot the victim above the right ear. The defendant recalled that he drove to a friend's residence where he admitted that he had "killed a boy." He also informed Agent Krofssik that several hours later he called the sheriff's department and asked for an officer to give him a ride. According to the defendant, he then threw the gun away in a swampy, wooded area off the side of a roadway. He claimed that his actions had been motivated by his love for Ms. Eldridge and his fear of the victim.

Agent Krofssik collected four .22 caliber shell casings at the residence of Jack Baker, where the defendant claimed to have fired the stolen weapon. Although the agent was unable to find methamphetamine near the body, he confirmed that a glass pipe had been in the victim's possession at the time of his death. At trial, the agent testified that officers found a Browning .22 caliber automatic pistol on the side of Highway 70 in the area where the defendant said he had disposed of the murder weapon.

Cumberland County Sheriff's Deputy Scott Jones, who at 2:00 a.m. on the morning of the shooting had been dispatched to Highway 70 North in Cumberland County to assist a 911 caller requesting a ride, drove the defendant to Sandy Creek Road. It was his opinion that the defendant, who was carrying a cellular phone and a duffel bag, was not under the influence of any intoxicants. The deputy recalled that the defendant claimed to have been involved in an argument with his wife and left "before things had got too heated."

In the two months prior to the murder, the defendant had helped James Ralph Bryant with a construction project at the residence of Steve Golden, in Nashville. During that time, the construction crew lived in the empty Golden residence and the defendant had confided that he planned to kill his wife's lover, explaining that "he wouldn't go to jail long because he'd get out on his being mentally ill or sick." According to Bryant, the defendant failed to report for work during

the last ten days to two weeks of the job. Bryant identified the Browning .22 recovered from the side of Highway 70 as being similar to a gun that he had purchased and then later traded to Steve Golden.

Bryant's wife, Connie Bryant, confirmed that approximately three weeks before the body was found, the defendant told her that his wife was having an affair and that he intended to kill her lover. When she counseled the defendant against his plan, he replied that "he would never go to jail over killing somebody because he'd been in Moccasin Bend before and that's where they would send him again."

At trial, Steve Golden testified that the Browning .22 recovered from the roadside, which had a distinguishing yellow mark, appeared to be his gun. Two to three weeks before the body was found, Jack Baker had seen the defendant with a black semi-automatic .22 caliber pistol with a four-to-six-inch barrel. He remembered that he and the defendant had fired the weapon and that officers later collected the spent shells from the Baker property.

After testing the pistol and spent shells, Agent Shelly Betts, a firearms examiner with the TBI, determined that the shells found at the crime scene and the Baker property were consistent with Winchester manufacture and had been fired by the Browning pistol. Agent Betts concluded that the bullet recovered from the victim's hood and the two from the body had the same "class characteristics" as the Browning and that they were also consistent with Winchester manufacture.

Dr. Charles Harlan, who performed the autopsy, testified at trial that the victim had three gunshot wounds to the head, any one of which would have been fatal. Two of the three bullets were found in the body. Decomposition of the body was consistent with its having been outdoors for approximately one week during the month of March. The blood tests indicated that the victim had used methamphetamine before his death.

The defense did not offer any testimony at the trial.

I

Initially, the defendant argues that the trial court erred by not granting a mistrial on the basis that two jurors saw him in custody during the course of the trial. After a lunch break, one of the female jurors asked the bailiff about a door leading to the lock-up area. The bailiff answered that it led to "where [they] keep the people that come[] up from the jail" and offered her and another juror the opportunity to look. When he opened the door, the area was empty. In the meantime, the elevator doors opened as a jailer was escorting the defendant to the courtroom. The defendant, who was dressed in a sport coat and tie, was not handcuffed, shackled or restrained in any way. The jailer quickly closed the elevator doors.

Due process requires that the accused be afforded the "physical indicia of innocence." Kennedy v. Cardwell, 487 F.2d 101, 104 (6th Cir. 1973). The use of shackles during a trial, for example, has been specifically condemned absent certain safeguards designed to assure that it would

not influence the issue of innocence or guilt.  Willocks v. State, 546 S.W.2d 819, 822 (Tenn. Crim. App. 1976); see generally State v. Smith, 639 S.W.2d 677 (Tenn. Crim. App. 1982).

"The entry of a mistrial is appropriate when the trial cannot continue for some reason, or if the trial does continue, a miscarriage of justice will occur."  State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994).  The decision to grant a mistrial is within the sound discretion of the trial court, and this court will not disturb the trial court's determination unless a clear abuse of discretion appears on the record.  Id.

Immediately upon learning of the event at issue, the trial court conducted a full hearing on the matter.  The two jurors swore under oath that their judgment would not be affected.  Because other jurors were aware that the two jurors had seen the defendant in the elevator, the trial court provided a curative instruction.  All of the jurors agreed to disregard the defendant's brief presence in the lockup area and otherwise follow the instructions of the trial court.  Because there is a presumption that the jurors followed the instructions of the trial court and because the record does not establish that the defendant was unduly prejudiced, there was no abuse of discretion by the denial of a mistrial.

II

Next, the defendant contends that the trial court erred by not instructing the jury on the lesser included offenses of aggravated assault and assault.  The state asserts that the offenses are not lesser includeds of first degree murder and that any error would have been harmless beyond a reasonable doubt.

The question of whether a given offense should be submitted to the jury as a lesser included offense is a mixed question of law and fact.  State v. Rush, 50 S.W.3d 424, 427 (Tenn. 2001) (citing State v. Smiley, 38 S.W.3d 521 (Tenn. 2001)).  The standard of review for mixed questions of law and fact is de novo with no presumption of correctness.  Id.; see also State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).  The trial court has a duty "to give a complete charge of the law applicable to the facts of a case."  State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986); see also Tenn. R. Crim. P. 30.

In Burns, our supreme court adopted a modified version of the Model Penal Code in order to determine what constitutes a lesser included offense:

An offense is a lesser included offense if:
(a) all of its statutory elements are included within the statutory elements of the offense charged; or
(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
(1) a different mental state indicating a lesser kind of culpability; and/or

(2) a less serious harm or risk of harm to the same person, property or public interest, or

(c) it consists of

(1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser included offense in part (a) or (b); or

(2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser included offense in part (a) or (b); or

(3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser included offense in part (a) or (b).

6 S.W.3d at 466-67.

The trial court has a duty to instruct the jury as to a lesser included offense if: (1) reasonable minds could accept the offense as lesser included; and (2) the evidence is legally sufficient to support a conviction for the lesser included offense. Burns, 6 S.W.3d at 469; see also State v. Langford, 994 S.W.2d 126, 128 (Tenn. 1999). Moreover, our supreme court has held that trial courts "must provide an instruction on a lesser-included offense supported by the evidence even if such instruction is not consistent with the theory of the [s]tate or of the defense. The evidence, not the parties, controls whether an instruction is required." State v. Allen, 69 S.W.3d 181, 188 (Tenn. 2002). Our high court observed that the "jury is not required to believe any evidence offered by the [s]tate," and held that the authority of the jury to convict on a lesser-included offense may not be taken away, even when proof supporting the element distinguishing the greater offense from the lesser offense is uncontroverted. Id. at 189.

In support of his position, the defendant cites State v. Paul Graham Manning, No. M2002-00547-CCA-R3-CD (Tenn. Crim. App., at Nashville, Feb. 14, 2003), perm. app. denied (Tenn. Dec. 15, 2003), in which a panel of this court held that the trial court erred by failing to instruct the jury on aggravated assault and assault as lesser included offenses of premeditated murder. While finding the error to be harmless beyond a reasonable doubt, the court ruled in Manning as follows:

As set forth above, first degree premeditated murder is the "premeditated and intentional killing of another." An aggravated assault is committed, on the other hand, when the accused intentionally, knowingly, or recklessly causes serious bodily injury to another. Similarly, an assault is committed when one "[i]ntentionally, knowingly or recklessly causes bodily injury to another." The mens rea of intentional includes the mens reas of knowing and reckless. A killing certainly includes serious bodily injury (as well as "mere" bodily injury). Thus, all of the statutory elements of these forms of aggravated assault and assault are included within the statutory elements of first degree premeditated murder, and they are therefore lesser-included offenses under part (a) of the Burns test. The trial court therefore erred when it failed to instruct the jury on these forms of aggravated assault and assault.

Manning, slip op. at 7 (citations and footnote omitted).

The majority of a separate panel of this court, however, has held that aggravated assault and assault are not lesser included offenses of premeditated murder. In State v. John C. Walker, III, No. M2003-01732-CCA-R3-CD (Tenn. Crim. App., at Nashville, Aug. 11, 2004), the rationale for the holding in Manning was rejected:

> An accused in a criminal prosecution has the right to receive advance notice of the charges he or she must defend upon. Tenn. Const. art. 1, § 9. When a defendant is indicted for murder, the defendant is placed upon notice that he or she will be required to answer to the charge or some lesser degree of homicide as raised by the proof at trial. Criminal homicide is defined as the unlawful killing of another person, which may be first degree murder, second degree murder, voluntary manslaughter, criminally negligent homicide, or vehicular homicide. Tenn. Code Ann. § 39-13-201. Aggravated assault is an assault accompanied by serious bodily injury or use of a deadly weapon. Tenn. Code Ann. § 39-13-102(a). Burns part (a) provides that aggravated assault is a lesser if all the "statutory elements are included within the statutory elements" of first degree murder. Burns, 6 S.W.3d at 466. The indictment in this case alleges an intentional and premeditated killing of the victim. It contains no reference to serious bodily injury or use of a deadly weapon. Clearly, none of the elements of aggravated assault are alleged in the indictment nor are these elements included within the statutory elements of first degree murder. Likewise, the elements of the various forms of assault, i.e., (1) bodily injury, (2) fear of imminent bodily injury and (3) physical contact regarded as extremely offensive or provocative, are not alleged in the indictment and are clearly not elements of first degree murder. See Tenn. Code Ann. § 39-13-101 (a)(1)-(3). For this reason, we conclude that neither aggravated assault nor assault are lesser included offenses of first degree murder under Burns. Thus, the trial court did not err in failing to charge these crimes to the jury.

Slip op. at 11-12.

Whether the rule in Manning or Walker is applicable, the defendant here would not be entitled to a new trial for failure to charge aggravated and simple assault. If error at all, the error was harmless beyond a reasonable doubt. See State v. David Wayne Smart, No. M2001-02881-CCA-R3-CD (Tenn. Crim. App., at Nashville, May 13, 2003) (holding that any error by failing to charge aggravated assault and assault as lesser included offenses of premeditated murder was harmless beyond a reasonable doubt). In this case, the trial court instructed the jury on the charged offense of premeditated murder as well as the lesser included offenses of second degree murder, voluntary manslaughter, reckless homicide, and criminally negligent homicide. By finding the defendant guilty of premeditated murder, the jury implicitly rejected four lesser included offenses. See Allen, 69 S.W.3d at 189; Manning, slip op. at 8. The evidence of murder was simply overwhelming. The proof established that the defendant drove the victim to a remote area, shot him in the head three times, and then abandoned the body. Under these circumstances, it is our conclusion that any error by virtue of the failure to charge either aggravated assault or simple assault was harmless beyond a

reasonable doubt.

III

The defendant next argues that the evidence was insufficient to establish premeditation. On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

First degree murder is defined as:

(1) A premeditated and intentional killing of another;

(2) A killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy; or

(3) A killing of another committed as a result of the unlawful throwing, placing or discharging of a destructive device or bomb.

Tenn. Code Ann. § 39-13-202(a) (Supp. 2000). Tennessee Code Annotated section 39-13-202(d) provides that:

[P]remeditation is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d) (1997). Whether the evidence was sufficient depends entirely on whether the state was able to establish beyond a reasonable doubt the element of premeditation. See State v. Sims, 45 S.W.3d 1, 7 (Tenn. 2001); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

-7-

Our supreme court has held that the presence of premeditation is a question for the jury and may be inferred from the manner and circumstances of the killing. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000); State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Moreover, it is well-established that premeditation may be proved by circumstantial evidence. See, e.g., State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). Our high court has identified a number of circumstances from which the jury may infer premeditation: (1) the use of a deadly weapon upon an unarmed victim; (2) the particular cruelty of the killing; (3) the defendant's threats or declarations of intent to kill; (4) the defendant's procurement of a weapon; (5) any preparations to conceal the crime undertaken before the crime is committed; (6) destruction or secretion of evidence of the killing; and (7) a defendant's calmness immediately after the killing. See State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); Pike, 978 S.W.2d at 914-15. This list, however, is not exhaustive and serves only to demonstrate that premeditation may be established by any evidence from which the jury may infer that the killing was done "after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d); see Pike, 978 S.W.2d at 914-15; Bland, 958 S.W.2d at 660.

One treatise suggests that premeditation may be inferred from events that occur before and at the time of the killing:

> Three categories of evidence are important for [the] purpose [of inferring premeditation]: (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, planning activity; (2) facts about the defendant's prior relationship and conduct with the victim from which motive may be inferred; and (3) facts about the nature of the killing from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

2 Wayne R. LaFave, Substantive Criminal Law § 14.7(a) (2d ed. 2003) (emphasis in original).

In this case, there was evidence that the defendant, aware that his wife was having an affair, had voiced to both Ralph and Connie Bryant that he intended to kill her lover. The Bryants attempted to dissuade him from his plans. The was proof that two or three weeks before the shooting, the defendant stole the .22 caliber Browning pistol from the Golden residence just before quitting a construction job in Nashville and returning to Putnam County. The defendant admitted shooting the victim and later disposing of the murder weapon alongside a rural highway. That the defendant had the presence of mind to call 911 for a ride from a sheriff's deputy without arousing suspicion suggests a calm demeanor after the crime. In our view, there is sufficient evidence in the record to support a finding of premeditation.

IV

Next, the defendant contends that the trial court should have suppressed his statements to police because the circumstances establish that they were coerced. The state argues that the defendant waived the issue by failing to timely raise it in a motion for new trial.

Tennessee Rule of Criminal Procedure 33(b), which governs the time for filing a motion for new trial, provides as follows:

> A motion for a new trial shall be made in writing, or if made orally in open court shall be reduced to writing, within thirty days of the date the order of sentence is entered. The [c]ourt shall upon motion allow amendments liberally until the day of the hearing of the motion for a new trial.

The record reflects that the judgment of conviction was filed on October 8, 2002. The defendant's motion for new trial, filed two days later, does not include as a ground for relief that the trial court failed to suppress the statements. At the hearing on the motion for new trial some four months later, however, defense counsel raised the issue and the trial court instructed him to amend the motion for new trial. An amended motion was filed on that date. The state did not object.

There was a full hearing on the motion to suppress. Detective Jerry Dale Abston of the Putnam County Sheriff's Department testified that he witnessed statements taken from the defendant by Agent Krofssik on March 24 and March 27, both of which were made in the conference room of the justice center. He recalled that the defendant, who received no promises of leniency, was cooperative, responding coherently and without difficulty. The detective confirmed that Agent Krofssik had provided the defendant with Miranda warnings and that the defendant never indicated that he wished to stop the interviews or have an attorney present. The detective recalled that the defendant acknowledged that he had been drinking prior to the March 24th interview but denied the use of any drugs. It was the detective's opinion that the defendant was not intoxicated at that time. Detective Abston testified that Agent Krofssik wrote out the defendant's statement longhand and that the statement was then read back to the defendant, who was given the opportunity to make corrections. He had no recollection of any request by the defendant to tape the interviews and insisted that the defendant had, in fact, declined to be taped because the recorder made him uncomfortable. The detective acknowledged that at the time of the first interview, the defendant mentioned that he had bipolar disorder. He remembered that the defendant repeatedly denied the need for any medication or treatment. Detective Abston denied that either he or Agent Krofssik had threatened to throw the defendant down the stairwell at the justice center or had otherwise coerced the confession.

Agent Krofssik corroborated the testimony of Detective Abston. He recalled that on the second interview day, the defendant mentioned that he was not taking his medication but "indicated that it didn't affect his understanding of what our conversation was about."

Eric Engum, a Ph.D. psychologist, performed psychological and neuropsychological evaluations of the defendant. He determined that the defendant was first treated for alcohol and drug abuse in 1994 and was hospitalized on an emergency basis in February of 2000 when he began experiencing, among other things, severe mood swings, temper outbursts, and disorganized thought processes. The medical history of the defendant indicated bipolar affective disorder and polysubstance abuse. Engum testified that shortly after the arrest of the defendant, he was diagnosed with schizo-affective disorder, bipolar type, and put on a medication regiment consisting of Effexor, Seroquel, and Eskalith, which lessened his symptoms. He found the defendant had difficulty sustaining concentration, organizing his thoughts, and engaging in abstract reasoning. According to Engum, he diagnosed the defendant as having bipolar disorder in partial remission, alcohol dependence in early full remission, and a mixed personality disorder with avoidant, depressive, and paranoid features. With regard to the defendant's ability to voluntarily waive his rights, he testified that "knowing what we know about [bipolar disorder] symptoms, it would seriously raise a question in my mind as to whether he was able to make a voluntary waiver. And that's as far as I can go." During cross-examination, Engum acknowledged that he had found evidence of symptom magnification, or "reporting symptoms . . . in stronger terms than might be uncovered upon objective review."

The defendant testified at the suppression hearing that he "really started drinking hard" in 1988 and that he first received treatment for alcoholism in 1994 at Plateau when he was convicted of third offense driving under the influence. He stated that although he had also received treatment at McFarland and New Life Lodge, his problems continued and, in February of 2000, he was committed to Lakeshore Mental Heath Center in Knoxville, where he stayed for five days. The defendant contended that on the day of his arrest, he drank a gallon of whiskey and smoked methamphetamine. According to the defendant, when Detective Abston telephoned him that there was a warrant for his arrest, he responded that he had been drinking and would turn himself in to Officer Bill Parrott. He claimed that the last thing he recalled was getting into the back seat of Officer Parrott's cruiser, unable to walk, and that the police "didn't even book [him]." The defendant testified that he remembered the second set of interviews with police "somewhat," but that he was not feeling well because he had been hallucinating, "seeing snakes in [his] walls and spiders coming out of [his] drain." He insisted that he was afraid that Detective Abston, and Agent Krofssik were going to throw him down the stairwell because one of them had mentioned that "[i]t was a long ways down." The defendant acknowledged, however, that early in the interview process, he took breaks in the conference room rather than the stairwell. He claimed that he had asked for the interviews to be tape recorded. While acknowledging that he had signed and initialed the written statements, he contended that Agent Krofssik had not read the statements to him and that the documents were only drafts.

The trial court denied the motion to suppress, finding that the defendant's statements were voluntary and ruling as follows:

> [W]e are dealing with a question of the voluntariness of a confession and the totality
> of the circumstances is the standard. Under the circumstances of how the statement

was allegedly made on the 27th, there would be nothing to indicate from the testimony of [the defendant] or from the testimony of the officers that something transpired that would over bear the will of the accused in this case in some sort of a threatening way.

\* \* \*

I don't think anybody can dispute the diagnosis. . . . But that in itself does not render any statement given to be voluntary or any waiver to be unknowing.

And all of the proof here that I've heard this morning would indicate that the defendant understood his rights. He waived his rights. And he gave a statement that he signed off on those rights. . . .

And . . . the totality [of the] the circumstances would indicate . . . that there was a voluntary and knowing waiver of the rights and a voluntary statement given. . . .

The trial court also questioned the credibility of the defendant, observing that he appeared to "have some selective memory loss."

It is the duty of the trial judge to determine the voluntariness and the admissibility of a defendant's pretrial statement. State v. Pursley, 550 S.W.2d 949, 952 (Tenn. 1977). The trial court's determination that a confession was given knowingly and voluntarily is binding on the appellate courts unless the evidence preponderates otherwise. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Questions about witness credibility and "resolution of conflicts in the evidence are matters entrusted to the trial judge." Id. Testimony presented at trial may be considered by an appellate court in deciding the propriety of the trial court's ruling on a motion to suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998). If the "greater weight" of the evidence supports the court's ruling, it will be upheld. Id. Yet, this court must conduct a de novo review of the trial court's application of law to fact. State v. Bridges, 963 S.W.2d 487 (Tenn. 1997); State v. Yeargan, 958 S.W.2d 626 (Tenn. 1997).

In Miranda v. Arizona, 384 U.S. 436 (1966), the United States Supreme Court ruled that before a custodial interrogation, police officers must advise a defendant of the right to remain silent and the right to counsel. If these warnings are not given, any statement elicited from a defendant is not admissible in trial. Dickerson v. United States, 530 U.S. 428 (2000); Stansbury v. California, 511 U.S. 318, 322 (1994). A defendant's rights to counsel and against self-incrimination may be waived as long as the waiver is made "voluntarily, knowingly, and intelligently." Miranda, 384 U.S. at 479; State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992). In order for an accused to effect a waiver, he must be adequately appraised of his right to remain silent and the consequence of deciding to abandon it. State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994). In determining whether a confession was voluntary and knowing, the totality of the circumstances must be examined. State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997).

Although three handwritten statements signed by the defendant are in the record, only the last statement was introduced at trial. The statement, which has been summarized in this opinion, was taken on March 27 at 11:38 p.m., shortly after the defendant asked to speak with the officers for a

second time that evening. By refusing to suppress, the trial court implicitly accredited the testimony of Detective Abston and Agent Krofssik that the defendant was coherent and responsive at the time of the interview, that he understood his <u>Miranda</u> rights, and that he knowingly and voluntarily waived those rights. A completed TBI <u>Miranda</u> warnings form bearing the defendant's signature appears in the record. The trial court specifically found that the defendant's testimony lacked credibility, the defendant having "selective memory loss" as to the circumstances surrounding his arrest and his sworn statements to the officers. In our view, the evidence does not preponderate against the trial court's determination that the statement was knowingly and voluntarily provided to the interrogating officers.

V

Finally, the defendant contends that the prosecutor was guilty of misconduct during the closing argument. He specifically complains about the following comments:

> You know . . . I'm looking at that scene . . . and I can't think of a better place to kill somebody. It's ten miles from nowhere, out in the boonies, and then almost 100 yards, almost 300 feet down a dirt road where there's no chance of being seen. There's no chance of having witnesses. I can't think of a better place in the whole wide world to take somebody to kill them if that's what your purpose is.
> Not a good place to hide your dope. People hide dope off of their property but close to their home. They don't have to drive.
> And isn't it interesting too who was doing the driving? The defendant was driving the truck that night and his victim was in the passenger seat. <u>And I suggest to you that you can assume that the defendant was in there at gunpoint being driven to</u> – (Interrupted)

(Emphasis added.)

Trial courts have substantial discretionary authority in determining the propriety of final argument. Although counsel is generally given wide latitude, courts must restrict any improper argument. <u>Sparks v. State</u>, 563 S.W.2d 564 (Tenn. Crim. App. 1978). Generally speaking, closing argument "must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried." <u>State v. Sutton</u>, 562 S.W.2d 820, 823 (Tenn. 1978). For example, our supreme court has ruled that argument that "that defense counsel was 'trying to throw sand in the eyes of the jury' and 'blowing smoke in the face of the jury'" was improper argument. <u>State v. West</u>, 767 S.W.2d 387, 395 (Tenn. 1989). To merit a new trial, however, the argument must be so inflammatory or improper as to affect the verdict. <u>Harrington v. State</u>, 215 Tenn. 338, 385 S.W.2d 758 (1965). In <u>Judge v. State</u>, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976), this court articulated the factors to be considered in making that determination:

> (1) the conduct complained of viewed in the context and the light of the facts and circumstances of the case;

-12-

(2) the curative measures undertaken by the court and the prosecution;
(3) the intent of the prosecutor in making the improper statements;
(4) the cumulative effect of the improper conduct and any other errors in the record; and
(5) the relative strength or weakness of the case.

Most restrictions during final argument are placed upon the state. That is based in great measure upon the role of the prosecutor in the criminal justice system:

[The prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the two fold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor, indeed he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. It is fair to say that the average jury, in a greater or lesser degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and especially assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

Berger v. United States, 295 U.S. 78, 88 (1935); see also Judge, 539 S.W.2d at 344-45. Thus, the state must refrain from argument designed to inflame the jury and should restrict its commentary to matters in evidence or issues at trial. The prosecutor must not express a personal belief or opinion, but whether that qualifies as misconduct often depends upon the specific terminology used. For example, argument predicated by the words "I think" or "I submit" does not necessarily indicate an expression of personal opinion. United States v. Stulga, 584 F.2d 142 (6th Cir. 1978). The prosecution is not permitted to reflect unfavorably upon defense counsel or the trial tactics employed during the course of the trial. See Dupree v. State, 219 Tenn. 492, 410 S.W.2d 890 (1967); Moore v. State, 159 Tenn. 112, 17 S.W. 30 (1929); Watkins v. State, 140 Tenn. 1, 203 S.W. 344 (1918); McCracken v. State, 489 S.W.2d 48 (Tenn. Crim. App. 1972). Although there may be no commentary on the consequences of an acquittal, the prosecution may point out the gravity of a particular crime and emphasize the importance of law enforcement. See State v. Dakin, 614 S.W.2d 812 (Tenn. Crim. App. 1980); Bowling v. State, 3 Tenn. Crim. App. 176, 458 S.W.2d 639 (1970).

This court has observed that there are five generally recognized areas of prosecutorial misconduct related to closing argument:

1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.

4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.

5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

Because there was no evidence that the defendant held the victim at gunpoint at any time, the prosecutor's suggestion that the jury assume that fact was improper. Nevertheless, it does not require the grant of a new trial. While overstating the supporting facts, the argument did not qualify as a gross exaggeration. Defense counsel objected immediately, interrupting the state's attorney, and the trial court sustained the objection, instructing the jury to disregard the remark. There is no indication that the prosecutors's error was intentional or meant to unfairly prejudice the defendant. An overzealous or overly partisan interpretation of the evidence often discredits the validity of the argument. Evidence of guilt included confessions to the police and others. Application of the Judge factors favor the state. A new trial is not warranted under these circumstances.

Accordingly, the judgment of the trial court is affirmed.

_____
GARY R. WADE, PRESIDING JUDGE

-14-